41 C.C.P.A.(Patents)

### Application of SCHUTT.
### Patent Appeal No. 6003.

United States Court of Customs and Patent Appeals.

Feb. 3, 1954.

Barnes, Kisselle, Laughlin & Raisch, Detroit, Mich. (Stuart C. Barnes, Detroit, Mich., of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (S. W. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY and COLE, Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Board of Appeals of the United

States Patent Office affirming the decision of the Primary Examiner rejecting, for lack of invention over the references, all of the claims, 11–27, 29–31, in appellant's application for a patent on alleged improvements in a machine and method for molding concrete blocks or similar products.

Claims 14–25, 29, and 30 are for the apparatus; claims 11, 12, 13, 26, 27, and 31 for the method. Claims 14 and 31 illustrate the nature of the involved subject matter. They read:

"14. A continuously cycling machine for molding concrete blocks or other products having in combination a frame, a pusher for pushing pallets from a stack to a molding position and at the same time pushing a pallet of the molded product out of the machine, a mold box, means for lowering and raising the mold box, a strike-off drawer, means for moving the strike-off drawer forward above the mold box and for withdrawing it to position for filling, a plate over which the strike-off with its open bottom passes, a magazine for feeding the aggregate into the strike-off drawer when the drawer is below the open bottom magazine, the said drawer being provided with a rearwardly extending plate to seal the open bottom of the magazine when the strike-off drawer moves away from the magazine, vibrating means, a packer head, means for dropping the packer head upon the contents of the mold box and for raising the packer head, and means for operating the aforementioned elements in the following sequence: move an empty pallet into position and at the same time, move the pallet with the block out of the machine, lower the mold box, move the strike-off drawer forward over the mold box, stop the operating connections in the machine and cause the drawer to pause over the mold box for a determined length of time, vibrate the mold box for a determined length of time of which

the determined pause is a part, start the operating connections of the machine again, move the strike-off drawer back under the magazine, stop the machine a second time for a determined period of vibration of the packer head determined by the descent of the packing head in the mold box, strip the block or product by moving the mold box upwardly, and raise the packing head.

"31. The method of operating a continuously cycling automatic concrete block machine, which machine has a hopper, a mold which is raised and lowered, vibrating means for elements in contact with the contents of the mold, means for feeding pallets below the mold, the mold then being lowered onto the pallet, the means conveying away the pallet with the molded block when the mold is raised, a strike-off drawer operating on a table between the lower open end of the hopper and at the proper time conveying a drawerful of aggregate across the table to the open top of the mold after the mold is lowered onto the pallet, a packing head which is lowered onto the contents of the mold when the feed drawer is withdrawn, the said method comprising running the machine in continuously cycling operations in which there is no pause in passing from one cycle to the next cycle but stopping all the parts of the machine except the vibrating means during two separate vibrating operations, one while the feed drawer is dropping the aggregate into the mold and the other while the pressure head is on the contents of the mold, and timing the vibrating periods and the two dwells to suit the aggregate being used in the first dwell and to get the correct height of the block in the second vibration, whereby the speed of the shifting operations of the machine can be higher and the production capacity of the machine per unit of time increased."

Appellant's improvement imparts a new and important characteristic to the old mode of operating block producing machines, the overall speed of which was limited by the maximum time required to mix and pack a load of the worst aggregate[1] by the vibration system. A dwell or rest period for other parts of the equipment was there provided during the mixing and packing operation. Appellant has provided two such dwell periods during two separate vibrating operations; one while the feed drawer is dropping the aggregate to be mixed into the mold, and the other while the pressure or packing head is on the contents of the mold. Appellant times the extent of the vibration and the two dwell periods to suit the aggregate being used in the first dwell and to get the correct height of the block in the second vibration. As summarized by appellant in his specification:

"* * * my improvement consists solely in improving the cycle of operation of the machine, and providing the necessary mechanism to stop and start the machine and the timing for this * * *."

The examiner during the prosecution of appellant's application, and in the first of two "final" rejections of the respective claims, relied upon the disclosures, singly or in combination, of the following references:

Romie 1,921,003 August 8, 1933;

Derry et al. 2,054,476 September 15, 1936; Wellnitz 2,308,132 January 12, 1943; Gelbman et al. 2,366,780 January 9, 1945; Darden 2,400,631 May 21, 1946; Reed 2,446,061 July 27, 1948.

There, among the grounds of rejection applied in the disallowance of the claims, the examiner held:

"The Gelbman and Wellnitz patents are regarded as basic references which generally anticipate both the structure of the apparatus claims and the method of the method claims. Both Gelbman and Wellnitz disclose the feeding of plastic material into a mold, the application of a tamper or press head to the material into the mold and the vibration of the material in the mold to compact the same under the influence of the press head, followed by the removal of the molded article from the mold. Gelbman discloses that vibration may be affected during the filling of the material into the mold and during pressing of the material into the mold under the influence of the press head."

The examiner further held that the elements incorporated by appellant consisted solely of old expedients, all of which would be obvious to any person having ordinary skill in the art, and that the improved results thereby achieved

[1] Appellant's brief provides this descriptive matter:

"Concrete and cinder blocks are extensively used, especially for foundations and basements. * * * These blocks were formerly molded in hand operated molds. The inside of the block is hollow; usually there are three large openings in the center of the block. These hollows are formed by metal cylinders called cores that are secured in the mold.

"When the cores are in place, an aggregate, which consists of a mixture of sand, cement, water, and gravel, is poured into the top of the mold and on the outside of the cores. Cinders, shale, crushed stone ore slag may be used in place of gravel. The mold is open at the top, and when the pouring takes place the mold rests upon a pallet, which is a heavy metal plate. Now the mixture has to be packed in the mold and around the cores. This was done in the earlier days by a tamping operation; that is, taking a blunt tool and punching or tapping the contents of the mold from the top. * * * molds filled with the aggregate were vibrated to shake the aggregate down and pack it. * * *"

The Solicitor for the Patent Office offers this pertinent observation:

"The problem confronting the appellant at the time of the alleged invention was occasioned by the fact that aggregates used in molding the blocks vary considerably in constitution and consistency, and, to form blocks of the proper type, some aggregates require extensive periods of vibration in the mold, while with others a relative short period is sufficient."

were merely those normally to be expected.

On appeal to the board, appellant filed with his papers an affidavit containing additional data the purpose of which was to establish by a proper showing not only the superiority of his improvement over the methods and machines of the prior art but also the prompt and extensive adoption by the trade of the machine to which his improvement was applied.

The examiner subsequently submitted his statement to the board and therein set forth his second "final" rejection of the claims asserting that he relied upon the prior art acknowledged in appellant's specification together with the affidavit hereinbefore described as constituting the basic reference; and the patents to Gelbman and Wellnitz as the secondary references.

Appellant's specification thus acknowledged the teaching of the prior art and described the distinguishing features of his alleged improvement:

'"In the commercial concrete block machines it is customary to have the cycle of operations so planned that machine operates continuously and a definite period in one cycle is allotted to each vibration period. The required vibration period may be considerably less than the allotted time and, consequently, a part of the cycle may be wasted thereby slowing up the production. For instance, in most concrete block machines it is customary to vibrate the mold box while the feed drawer is over the mold box spilling its contents into the mold box. It is also customary to vibrate the packer head when this is seated on the contents of the mold box. * * * Heretofore, the machines have been designed to allot a sufficient time in the cycle to provide for the maximum time that vibration might take place consequently, when much less time is used for the vibration than the time allotted some seconds of time may be lost when no useful operation is being performed by the machine and, therefore, production is slowed up to this extent.

"What I propose to do is to completely stop the machine during either or both vibration periods and stop the machine only the necessary time to go through the required vibration. * * *

"I find that this elimination of wasted time in the cycle makes it possible to greatly increase the production per hour. * * *"

Appellant also alleged in the specification or supporting affidavit of record that machines for molding concrete blocks are expensive machines, many of which sell for $25,000 or more; that in the use of the special method and machine defined by the appealed claims, the overall cycling speed of each machine, compared with those of the prior art, is increased to the extent of 25 to 50 per cent per minute; and that the increased productivity thus obtained results in cheaper blocks, both from the standpoint of the cost of the machine and the labor involved in the operation thereof.

Gelbman et al. was granted upon an application for a patent on a concrete block machine, shown in 20 figures of the drawings. Two claims were allowed to the patentees for a method of operating a building block machine which packs the mold by the vibration system in such a manner that the blocks produced will not be packed more densely in the bottom of the block than at the top. Eight hand operations are included in the operation of the machine. The following is an authentic excerpt from appellant's brief relative to the pertinent disclosure of Gelbman et al., numerical references to record being here omitted:

"The operator in Gelbman places three pallets in the mold by dropping them in by hand. He turns a crank and the strike-off drawer advances from under the magazine to a position over the mold and drops the contents of the drawer into the mold around the cores. Thereupon the

operator closes [the] switch and this starts the vibration of the mold. The timer determines how long the vibration takes place, depending on how it has been set. When the vibration ceases the operator turns the crank another 90° and the packer head comes down on the contents of the mold. Again the operator closes [the] switch and the vibration of the mold takes place again with the packer head on the contents of the mold. The timing is for exactly the same period because the same timer controls this vibration period. * * *

"When this is accomplished, the operator moves the crank another 90°. This causes the frame of the stripper pins to rise and eject the pallet and the molded block from the mold. * * *

"The eight different hand operations take place during one cycle. (1) The pallets are dropped in the molds. (2) The crank is turned 90° by hand. (3) The vibrator switch is closed by hand. (4) The crank is turned again. (5) The vibrator switch is closed again. (6) The crank is turned a third time. (7) The crank is turned a fourth time. (8) The frame is pulled forward to pull the blocks out of the machine. Now all this hand operation is in contrast to applicant's machine which has no hand operation at any time.

" *    *    *    *    *

" * * * In the application under appeal part of the vibration period is fixedly controlled by the cams on the cam shaft which establish the number of degrees on the cycle through which the vibration takes place. The timer regulates and controls the stoppage period or the dwell. It is this dwell, plus the degrees through which the vibration takes place that controls the total vibration time in Schutt. In Gelbman the timer alone controls the vibration period. The machine has no control of the dwell period."

The patent to Wellnitz was granted for a machine which produces in its normal operation molded products of plastic materials, such as concrete building blocks, wall tiles and other analogous products. The invention was designed, among other reasons, to provide (1) "improved means in a machine * * * which, when operated at production speeds, will form successive blocks with each block possessing a standard height dimension, avoiding the lack of uniformity in this regard hitherto present;" and to provide (2) "a concrete block-forming machine wherein a switch mechanism is automatically operated by the drop-type platen when the desired degree of compaction of the concrete mix in the mold box is obtained."

The pallets of Wellnitz are dropped into the mold by hand and the molded blocks are lifted out by hand. It is a one cycle machine which stops or dwells in its circuit for a sizing operation effected by the sinking of the packing head into the contents of the mold while the mold is being vibrated. Appellant accurately notes in his brief:

"The machine has no timer in the sense of an adjustable timer such as applicant uses and such as is shown in the Gelbman patent. There is no separate vibration period for the mold box and another vibration period for the packer head. There is only one vibration period and the mold box gets all of this and the packer head gets part of it as long as it rests on the contents of the mold while the vibration takes place."

The tribunals of the Patent Office have acknowledged that none of the reference patents, without redesigning, discloses the precise machine and cycle of operation defined by the rejected claims; and that "When redesigning Gelbman's machine for automatic operation as taught by Wellnitz it would be obvious

to provide adjustable and independent means to control the periods of vibration," as appellant has done.

Appellant in support of his contention for the allowance of the appealed claims cites the case of Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177, which held:

"It was certainly a new and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

The Supreme Court subsequently held also that a comparatively slight adjustment in the equipment of a large mechanical device by which the production thereof was greatly enhanced entitled the improvement to the protection of patent claims; that prompt and extensive adoption by the trade of the machine to which the improvement was applied constituted a proper consideration in determining the question of patentability; and that claims for a very meritorious improvement on an old machine, substantially advancing the art, are entitled to a liberal construction. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 56, 43 S.Ct. 322, 67 L.Ed. 523.

■ Our court in the case of In re De Lancey, 159 2d 737, 741, 34 C.C.P.A., Patents, 849, 855, held that a method claim on the performance of a machine may be allowed, "provided the machine is operated upon a new, useful, or inventive principle or method." The fact that a newly claimed machine and special method, when viewed after disclosure and explanation by an applicant, consist of simple elements such as should have been obvious to those in the field, does not necessarily negative invention. It may even be some evidence thereof. In re Osplack, 195 F.2d 921, 39 C.C.P.A., Patents, 932. Moreover, the Patent Codification Act, § 112, 35 U.S.C.A. § 112,[2] among other things, now provides:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

■ Since no ground of rejection stated by the examiner was expressly reversed by the board, we have before us all of his grounds of rejection. In re Borcherdt, 197 F.2d 550, 39 C.C.P.A., Patents, 1045; In re Boyce, 144 F.2d 896, 32 C.C.P.A., Patents, 718. A careful analysis of the facts presented in the record establishes, however, that there is no essential difference between the grounds of rejection enumerated in the separate statements submitted to the board by the examiner.

■ There are twenty rejected claims in issue. Some are devoid of the essential features upon which appellant has relied to endow the claims with patentability. Other claims call for the stoppage of the machine in such broad terms that the claims are readable on the

2. The bulletin "American Patent Law Association," October 1953, at page 214, contains this noteworthy item relative to the interpretation of this statute:

In a decision by an augmented Board of Appeals of the Patent Office, reported in 675 O.G. 5 (October 6, 1953), Ex parte Charles F. Ball and Richard T. Hair, Section 112 of the Patent Act of 1952 has been interpreted for the first time by the Patent Office. Among other things, it was held that where the function specified "results in a characteristic operation of the system as a whole which * * * patentably distinguishes the combination claimed from the reference system and it is by virtue of the novel coaction between the * * * means and the remaining elements of the system that the new result is realized", such claims sufficiently specify the novel structure under this section.

methods and devices of the prior art. Accordingly, the rejection of claims 11, 12, 13, 17, 20–27, and 29 is sustained.

On the other hand, apparatus claims, 14, 15, 16, 18, 19, and 30 define a patentable combination; and claim 31 a new and inventive method of operating an old machine. All of these claims should be allowed.

For the reasons hereinbefore stated, the decision of the Board of Appeals is accordingly modified.

Modified.