Milton H. OLENDER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14916.

United States Court of Appeals
Ninth Circuit.

Sept. 24, 1956.

Rehearing Denied Nov. 8, 1956.

Leo R. Friedman, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., John Lockley, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before HEALY, CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

This is a criminal prosecution for income tax evasion. Appellant was convicted on four counts charging him with wilfully attempting to defeat and evade federal income taxes by filing false and fraudulent returns. Counts 1 and 3 had reference to his own 1945 and 1946 income tax returns; counts 2 and 4 to his wife's 1945 and 1946 income tax returns, which he prepared.

The government relied on the "net worth method" of establishing guilt. This required the government to show "with reasonable certainty" the opening net worth of appellant as of December 31, 1944, his net worth as of December 31, 1945, and his closing net worth as of December 31, 1946, Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150, and that appellant and his wife realized taxable income which they failed to report. According to the government's computations, appellant and his wife should have reported net taxable income of $87,999.24 in 1945, and $43,212.-

00 in 1946. Appellant had returned $41,-067.61 in 1945, and $23,514.62 in 1946. The figures included the income of both the husband and the wife, who reported their income on a community property basis.

The defense attempted to show that the net worth of appellant and his wife, as of December 31, 1944, was higher than that computed by the government, that the increase in their net worth was less, and that the greater part of this increase did not represent taxable income because it belonged to someone else, or was obtained through nontaxable gifts.

Most of the facts on which the government based its calculations were contained in a stipulation between the parties and an amendment thereto. There were 1,000 pages of record, and many exhibits.

Appellant urges the conviction must be reversed because of insufficiency of the evidence as to net worth, and because the testimony of witness John Sanchirico was improperly admitted.

### Insufficiency of Evidence

Appellant specified the evidence was insufficient to establish the offenses charged in that his net worth at the three critical dates was not established to a reasonable certainty. This was because:

(a) Appellant had $70,000 plus, in cash, in a safe deposit box on December 31, 1944, and not $50,000, as the government contended.

(b) The $20,000 in par value of government bonds in appellant's possession at the end of both 1945 and 1946 were the property of and had been purchased by appellant's mother, Mollie Olender, and were not his property, as the government contended.

(c) Appellant had $20,550 in merchandise (sailor suits) on hand at the end of 1944, which were not included by the government as assets.

(d) Appellant should not have been credited with $7,724 on hand at the end of 1945, which the government computation included.

In the previous appeal the decision of this court, Olender v. United States, 210 F.2d 295, emphasized that there was a decided conflict in the evidence, and "since the defense case rested primarily upon the testimony of appellant, it was his credibility which was principally at issue." The same may be said of the second trial.

A reading of the transcript quickly indicates that the methods used by appellant to keep track of his financial affairs did little to inspire confidence in either his integrity or his truthfulness. Appellant was no untutored son of the soil. He was a university graduate with a bachelor of science degree, "with honors", in economics. He had studied principles of accounting, statistics, money and banking, cost accounting, corporation finance, business organization and administration, factors in industrial efficiency, and other comparable subjects. He was sufficiently well versed in income tax procedure to make out income tax returns for himself, his wife, his mother, and his friends. His memory of business transactions involving many thousands of dollars was, to put it charitably, not good.

Mr. Ringo, a certified public accountant hired by appellant, attempted to prepare a net worth statement for his client but ran into numerous difficulties. When one set of figures furnished by appellant had been worked out, some new expenditure would come to light, and throw the proposed statement "out of balance." As an example, Ringo, after coming to preliminary conclusions, discovered records showing appellant's purchase, theretofore undisclosed to the accountant, of a single premium, fully paid, life insurance policy costing $15,833.46, in 1945. It was then that appellant, for the first time, told his accountant about $10,500 in cash moneys his mother allegedly had given him. Appellant suggested to his accountant that no mention be made of a $5,000 investment in Asturia Export Corporation, made in 1944, because it was then worthless; that Ringo should "leave this out." His accountant ex-

plained this could not be done, because its then worthlessness bore no relationship to the net worth issue upon which the government's case was based.

On many other factual matters the appellant could not be considered a convincing witness. He could give no estimate of what his living expenses were in 1945; had no record of such expenses; no idea of what food cost for three people in 1945; no idea nor estimate as to such matters in 1946. He also testified that in 1945 he received $2,500 or $3,000 from his wife's mother, Mrs. Foote, although she had been on old age assistance for seven years.

Appellant claimed he lived frugally in 1945. The stipulated personal expenses deductible, i. e., the appellant's cost of living for himself, his wife and daughter for that year, was $2,739.38. This was some $230 less than the deduction he claimed that year for donations to charity.

Before trial appellant supplied certain information to his accountant, Ringo, explaining the extent of cash moneys kept by him in his safe deposit box. These were appellant's estimates only. These estimates showed (United States Exhibit 19) $50,000 on hand on December 31, 1944; $7,000 on hand on December 31, 1945; and zero on hand on December 31, 1946. But these estimates were not haphazardly arrived at:

"Q. Did you go over that net worth statement with Mr. Olender after it was prepared? A. (By Mr. Ringo) Very much so, yes."

At the trial appellant claimed he had over $70,000 in cash on hand in his safe deposit box on December 31, 1944. There is corroboration that in May of 1944 appellant did have $70,000 or $71,000 cash in his box. This corroborated evidence raised the preliminary question of the worth of United States Exhibit 10— the final product of appellant's accountant's efforts to establish valid net worth statements—and the subsequent question as to whether or not the government's evidence had been corroborated.

Appellant remembered with certainty that he had in the box in cash in the beginning of 1945, "over $70,000." At the end of 1945 he could approximate no figure. It was more than $5.00. But he had no positive recollection. At the beginning of 1946, defendant's answer was the same, and at the end of 1946, he couldn't approximate it, "it would only be a guess." "There was some money in there, I don't remember how much."

In the original net worth figures prepared by appellant's auditor from information supplied by the appellant (though only as estimates), appellant was hard put to explain how he accumulated large sums of cash he thereafter expended. So that appellant might rebut any inference that his expenditures in 1945 and 1946 were from unreported taxable income, appellant submitted to the government, through his auditor, an analysis of his net worth January 1, 1942, to December 31, 1947. (Olender's Exhibit 7, attached to his Exhibit 1, which was United States Exhibit 10 in this trial.) Appellant's Schedule A, attached to such Exhibit 7 (part of United States Exhibit 10), read as follows:

"Milton H. Olender,
Gifts from Mrs. J. Olender—Mother
(per Books of Mrs. J. Olender—
Information from M. H. Olender)
"Withdrawals from Savings Account
In Fresno:

| Date | Amount |
|---|---|
| February 3, 1942 | $ 1,000.00 |
| March 31, 1943 | 1,000.00 |
| January 6, 1944 | 2,000.00 |
| July 5, 1944 | 2,500.00 |
| December 15, 1944 | 1,000.00 |
| January 2, 1945 | 3,000.00 |
| | $10,500.00" |

At the first trial, appellant testified that these moneys were given him by his mother in cash. At the second trial, the government produced important testimony bearing on these alleged gifts. United States Exhibits 40 through 48, inclusive, were photostats of the records

of the Bank of America, Fresno Branch. They showed Mollie Olender's savings accounts No. 3941 and No. 2146 (deposits and withdrawals) and Mollie Olender's commercial accounts. These records show that Mrs. Mollie Olender:

(1) Withdrew $1,000 from savings account No. 3941 on February 3, 1942, and that she deposited the same in her savings account No. 2146 on the same day. She withdrew $200 of it from No. 2146 that day.

(2) Withdrew $1,000 from savings account No. 3941 on March 31, 1943, and deposited it to her commercial account.

(3) Withdrew $2,000 on January 6, 1944, from account No. 3941, and deposited it to savings account No. 126 of Terry Olender Gamborg. This had not been withdrawn up to June 30, 1952.

(4) Withdrew $1,000 on December 15, 1944, from No. 3941, and deposited it on the same day in her commercial account. No withdrawals of any similar sums had been made from the commercial account up to June, 1945.

(5) Withdrew $3,000 on January 2, 1945, from No. 3941 and deposited it to Terence [sic] Olender Gamborg.

(6) Withdrew $2,500 on July 5, 1944, from the First National Bank in Fresno. There was no evidence of redeposit of this money, and appellant testified it was given to him. See "some corroboration" in defendant's Exhibit Q, although appellant's oral testimony was unprecise.

Thus, as to five of the six gifts testified to by appellant under oath, this documentary evidence proved the falsity of his testimony.

█ A lack of certainty or an utter lack of recollection on the part of the taxpayer cannot tip the scales against the government, for "skillful concealment" cannot be an "invincible barrier to proof." United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 1240, 87 L. Ed. 1546.

An inadequate system of recording income hardly places the taxpayer in a different class than one who keeps no books at all. "Both are receiving unrecorded amounts of income." United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 189, 99 L.Ed. 202. In the Calderon case, where defendant relied on a "hoard" in his safe deposit box, a lesser increase in assets ($48,000 in four years) over and beyond income, plus receipt of unrecorded amounts of taxable income, was sufficient variance, compared to reported income, to support an inference of tax evasion. We think the same inference clearly exists here. That same case (Calderon) disposes of appellant's claim that each year's figures must be established to avoid fatal uncertainty. In Calderon, taxpayer's hoard was alleged to have been $16,000 or $17,000; the government's net worth computation started with $500.

"But one problem remains. The $17,000 hoard of cash could have absorbed the computed income deficiency for one or more of the prosecution years, and respondent was convicted on all four counts. It might be argued * * * that there must be evidence * * * [of] a deficiency for *each* of the years here in issue. There is no merit in this contention. * * * [The evidence] need not comply wih the niceties of the annual accounting concept." Calderon v. United States, 348 U.S. 160, 168, 75 S.Ct. 186, 190.

#### The $20,000.00 in Bonds

Appellant relies heavily on his contention that $20,000 of bearer bonds in his safe deposit box were purchased by him for his mother, with her money. Appellant had two safe deposit boxes, one in his name; one in the joint names of himself and his mother. The bonds were kept in the former box. In 1947, appellant returned as his own property the income from these bonds. In other years, his mother returned the interest, on returns prepared by appellant. Appellant testified he kept these bonds in an envelope at the time of the first trial, with his mother's name on the envelope. Appellant did not produce the envelope at

either trial, although he had it at the time of the first trial, nor did he know what happened to it after the first trial, nor whether it had been destroyed, nor when he had last seen it.

On August 23, 1946, appellant wrote in answer to a letter of inquiry from the government that the $20,000 in bonds were "purchased for the account of my mother, * * * on written instructions from her, which I have in my possession." Appellant apparently referred to two letters written by his mother. The first letter, dated November 23, 1945, states:

"If you do buy the bonds, just put them in our box for safekeeping."

and the second letter, dated December 14, 1955, reads:

"I have been forgetting to mention those bonds you bought for me last week."[1]

No evidence was advanced to show any withdrawals from Mrs. Mollie Olender's bank accounts, with which the $20,000 in cash could have been advanced to appellant, which was the procedure appellant followed when the government questioned the $10,500 he claimed in gifts from his mother.

Mollie Olender died June 2, 1951. Nothing had been done by appellant prior to her death to obtain her version of this transaction, beyond his retaining the letters above described.

The federal estate tax return (United States Exhibit 52) filed December 15, 1952, (by appellant's sister, not by appellant) shows that decedent, Mollie Olender, had purchased over $25,000 par value in government bonds and had them issued in joint tenancy with her daughter, and over $17,000 par value in government bonds, and had them issued in joint tenancy with her son, the appellant. The estate tax return further stated:

"The decedent may have had an interest in $20,000 United States Treasury Bonds * * * as for the past few years interest of $450 on bonds of this type was included as income in decedent's income tax returns. Decedent's son was her accountant and prepared her income tax returns."

On March 30, 1953, after the first trial, a supplemental inventory was filed by this appellant, as co-executor, in the estate of Mollie Olender, deceased, listing the $20,000 in bonds as part of the estate. On July 13, 1953, the $20,000 were sold on order of "Estate of Mollie Olender, by Milton Olender," and the proceeds credited to the estate. Again, on the issue of his mother's ownership of $20,000 in bonds, there was ample conflicting evidence from which the trier of fact could come to a conclusion either way as to whether the appellant had used his mother's money or his own, to purchase these bonds.

### The Sailor Suit Inventory

Although appellant claims he should be credited with having purchased $20,550 worth of sailor suits from one Goodman in 1945, he could, in 1947, remember but one transaction with Goodman, involving $1,380 and had no recollection of the $20,550 transaction involving the issuance and transmission of nine cashier's checks. Even after being shown the checks, and the applications therefor, bearing his signature, appellant "could not recall the circumstances" under which he had issued such checks and acquired this merchandise. This mer-

---

[1]. The pertinent portions of this letter, in appellant's opinion expressed on the stand, continue as follows:

"When you get them, keep them up there for me; as I wrote you previously before, I still prefer that you put your money into government bonds instead of stocks. I realize the Bank of America dividends are higher and what you say about them is true. When you make your next payment to me, I may let you convince me, but I still think the bonds are the safest investment."

This reference to "your money" is more consistent with the appellant buying bonds with his own money than it is that the money belonged to his mother.

chandise, though kept in the store and later sold, was never listed as a part of appellant's inventories, never entered on appellant's books as having been purchased or sold, and never insured, because it was "worthless" or "was to be returned" or because "no profit was made on it." When appellant's own auditor, Mr. Ringo, attempted to ascertain the facts about this merchandise, Ringo was told to take the matter up with appellant's lawyer. It was not until after the first trial of this matter that Mr. Ringo was told by appellant of "merchandise on hand, not included in inventories."

### The $7,724 Item

Should $7,724 have been included as an asset of appellant at the end of 1945?

According to one interpretation of the evidence, the $7,724 represented a part of the $20,550 figure commented upon above. This was the transaction concerning which, at first, the appellant had no memory. But he testified that after he had received the suits from Goodman, through Levy, Levy in 1945 sold 200 suits for $5,000 which went into the Army and Navy books as a capital investment. But, in 1945 when 280 more suits were sold for $7,000, Levy kept the money. This, Levy gave to Moe Saraga, a dealer in New York. Appellant then gave Saraga $24,500 from his "store account". Saraga could not deliver all the suits wanted, and so returned the $7,000 plus $725 for 49 suits undelivered from the $24,800 advance, which amount, less $1 for a bank charge, represents the $7,724 claimed.

Obviously, if the trier of fact were to credit the appellant with the $20,500 in sailor suits, it should not again credit the $7,000 representing cash received through sale of some of those suits. And whether or not the $7,724 were included as an asset of appellant at the end of 1945, it would have increased or reduced the amount of undeclared income, but it would not have done so appreciably, nor to a degree decisive of the issues herein.

█ The foregoing recital of certain of the evidence is not exhaustive.

It is merely to highlight the reasons why the conclusion of the appellate court, after the first trial, is equally pertinent after the second trial—that the credibility of the appellant was the principal issue in the case. We cannot say that the government did not establish "with reasonable certainty" appellant's net worth as of December 31, 1944. When the government introduced proof of likely taxable sources from which a jury can reasonably find that the net worth increases sprang, it need not negative all possible non-taxable sources.

█ In criminal prosecutions for federal income tax evasion, evidence corroborative of defendant's admissions need not prove the offense beyond a reasonable doubt, or by a preponderance of the evidence, but there must exist substantial evidence, independent of the alleged admission, that the offense has been committed, and the evidence as a whole must prove defendant's guilt beyond a reasonable doubt. Smith v. United States, 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192; United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202.

The care with which the trial judge instructed the jury on this subject is of importance. Among other instructions the jury received was this:

"In order to safeguard the defendant, the law requires that these statements (of defendant) relating to vital links in the government case be corroborated. In this connection, the $50,000 cash item and $7,000 cash item, used by the government in Exhibit 50 (i.e., amount of cash in safe deposit box) cannot be considered by you in determining the opening or closing net worth, because the government did not corroborate that. You can use, however, whatever amounts the defendant said he had while he was on the witness stand here under oath."

We conclude the jury was properly and carefully instructed, and we will not interfere with their decision on issues of fact, in view of the conflicting testimony in this case.

This brings us to the alleged error in admitting the testimony of John Sanchirico.

It should be said that much of the criticism of the introduction of this testimony goes to its weight, and not to its admissibility. The witness, as executive vice president of Seagoing Uniform Corporation, was capable of identifying the records of that business. He had worked with the company over 25 years, had been active in management of it over 15 years. His firm had an account with the Army & Navy Store at 1926 Broadway, Oakland, the appellant's place of business. Sanchirico did not know appellant, but did know Goodman, the man to whom defendant sent several thousand of dollars with which to buy sailor's uniforms. Goodman paid the invoices. Sanchirico's plant shipped uniforms in accordance with Mr. Goodman's instructions, to the ultimate consignee. A shipping clerk would hand-write a shipping memorandum which would indicate how many garments were involved, and where they were shipped to, name of customer, and the street number or city. Exhibits 66 to 71 inclusive, all indicated, according to the witness, shipments of sailor suits to Olender. These documents were kept by the company and were made simultaneously with the transaction, in the regular course of business.

The only objection made to Exhibits 66 to 71 was that they were "not proper rebuttal." This objection was not well taken; nor, had an objection been made upon grounds of hearsay, would it have been valid. *Part* of each document did not purport to involve the appellant, but *part* of each written document did. The objection on grounds of hearsay, not having been made before the trial court, cannot be urged here as reversible error. Sekinoff v. United States, 9 Cir., 283 F. 38; Bank of Italy v. F. Romeo & Co., 9 Cir., 287 F. 5.

We recently ruled on this same evidentiary point in civil litigation, Batelli v. Kagan, 9 Cir., 236 F.2d 167. In this criminal prosecution, Rule 26 of the Rules of Criminal Procedure, Title 18 U.S.C.A., applies, rather than Rule 43 of the Rules of Civil Procedure, Title 28 U.S.C.A. The "Act of Congress" necessary to make the principle of the "Uniform Business Records in Evidence Act" applicable is Title 28 U.S.C.A. § 1732. The very purpose of this section is to relax the common law evidentiary rule, and permit introduction into evidence those contemporaneous business records which once were inadmissible. Hartzog v. United States, 4 Cir., 1954, 217 F.2d 706. And even if such business records, such as bills of lading, are hearsay as to the appellant, they are admissible as records made in the regular course of business. Intermondale Trading Co. v. North River Ins. Co., D.C., 1951, 100 F.Supp. 128. Evidence disclosing a manufacturer's practice relating to invoices establishing the contents of clothing cartons, was held admissible in United States v. Garvey, 2 Cir., 1945, 150 F.2d 767.

The judgment of conviction on all four counts should be, and is, affirmed.

### On Petition for Rehearing.

### PER CURIAM.

The Petition For Rehearing consists primarily of an endeavor to re-discuss and re-weigh the sufficiency of the evidence. On this point, our view remains unaltered.

The sole issue of substance raised by the petition for rehearing relates to an alleged misapplication of the Calderon case, to the instant facts. Appellant asserts that we have cited and relied upon Calderon as authority for the proposition that there need not be evidence of a tax deficiency for *each* of the years in question, 1945 and 1946. The precise language of the case as we quoted it justifies that position.

Obviously, Calderon does not stand for that proposition, nor was it referred to for such purpose. In order to correct appellant's misconception as to the nature of our reliance on the Calderon case, we now clarify our reference thereto.

The quotation of the Calderon case should read as follows:

"But one problem remains. The $17,000 hoard of cash could have absorbed the computed income deficiency for one or more of the prosecution years, and respondent was convicted on all four counts. It might be argued that independent evidence showing a $30,000 deficiency is not enough—that there must be evidence that this sum resulted in a deficiency for *each* of the years here in issue. There is no merit in this contention. In the first place, this evidence is merely *corroborating* respondent's cash-on-hand admissions and need not comply with the niceties of the annual accounting concept. While the evidence as a whole must show a deficiency for each of the prosecution years, the corroborative evidence suffices if it shows a substantial deficiency for the over-all prosecution period." [348 U.S. 160, 75 S.Ct. 190.]

We are aware of, and we are bound by the Supreme Court's statement that "the evidence as a whole must show a deficiency for each of the prosecution years".

■ We affirm that the government must establish *some* deficiency for each of the years. Otherwise, there could be no violation. However, it seems equally plain that it is not incumbent upon the government to prove the amount of the deficiency with mathematical exactitude for each year in a prosecution involving consecutive years. A contrary rule would enable the guilty to say, "Yes, I am guilty, but since you cannot allocate the deficiencies to each particular year with exactness, although there was some deficiency in each year, I must go free." We reject the idea that surreptitious dealings which inhibit the prosecution's ability to make a precise allocation for each year can furnish a cloak of immunity to tax evaders. We do not feel that Justice Clark's words were designed to erect an artificial barrier to tax enforcement. The evidence clearly supports the jury's finding of a tax deficiency in both 1945 and 1946.

The Petition For Rehearing is denied.