**David Lorenzo OSWALT, Plaintiff,**

v.

**WILLIAMSON TOWING COMPANY, INC., Defendant.**

**No. GC 72–46.**

United States District Court,
N. D. Mississippi,
Greenville Division.

April 20, 1973.

305

---

Douglas Abraham, Greenville, Miss., for plaintiff.

J. Murray Akers, Greenville, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This admiralty action was brought by David Lorenzo Oswalt against his employer, Williamson Towing Company, Inc., (Williamson) for personal injuries he sustained while working as a deck-

hand aboard defendant's towboat, the M/V GREENVILLE, on navigable waters near La Crosse, Wisconsin.

According to the complaint and plaintiff's proof, plaintiff was injured May 27, 1971, during hours of darkness while tending to barges under tow by the GREENVILLE. The accident is said to have occurred when plaintiff encountered a fouled wire on a barge coupling; he attempted to disentangle the wire by pulling it free, and as he pulled backward on the wire, it suddenly became disengaged. Plaintiff claims this caused him to lose his balance, step upon a metal "cheater" pipe to his rear, and fall onto a ratchet, causing serious back injury.

Plaintiff asserts that his injuries were caused by the vessel's unseaworthiness and Williamson's negligence in the following particulars: (1) Defendant's failure to provide adequate lighting or illumination of the work area of the barge; and (2) defendant's failure to provide for an adequate method of policing the barge deck and for securing in storage areas metal pipes or similar objects, which, although required in plaintiff's work, created an undue hazard to the footing of seamen when left unattended. Plaintiff also maintains that he is entitled to maintenance and cure and damages for his employer's failure to provide same.

Defendant strongly disputes that plaintiff's working area was inadequately lighted or that an unattended metal pipe was the proximate cause of plaintiff's accident and resulting injury. Further, defendant contends that plaintiff waived his right to maintenance and cure by voluntarily refusing medical treatment proffered by the employer. Thus, the disputed issues are primarily factual.

The incident occurred at approximately 2:30 a. m., when the M/V GREENVILLE, upbound with 12 loaded hopper barges, was approaching and preparing to enter Lock 7 in the vicinity of La Crosse. The barges, in a tow three wide and four long, were secured together by rigging which consisted of steel cables and ratchets. Because of the length of the tow, Lock 7 could not accommodate the contemporaneous passage of the flotilla; and, to negotiate the lock and thus move to a higher water level, it was necessary to utilize a "double tripping" maneuver. That is, the first half of the tow (6 barges) would be maneuvered into the lock chamber, the rigging "broken" or disconnected from the latter 6 barges by the deck crew at the "break" coupling,[1] the lock chamber closed, and the barges raised to the higher level. The GREENVILLE and the remaining 6 barges would then proceed through the lock, after which the crew would reestablish the rigging at the break coupling.

Plaintiff, as a deckhand, was required to assist in removing the break coupling rigging during the double tripping operation and in securing the rigging upon completion of the maneuver. Plaintiff was an experienced deckhand and familiar with his duties relating to double tripping a lock, including Lock 7. He was instructed to proceed to the break coupling and man the outboard starboard side. This made him responsible for removing the safety wire rigging on the starboard side after the head of the tow had entered the lock chamber, and, upon the lead half of the tow being firmly secured to the lock wall, also responsible for removing the jockey wire at the starboard coupling and assisting in removing the remaining rigging along the break coupling. Plaintiff

---

1. The break coupling of a tow is comprised of sets of rigging at separate coupling points extending laterally across the tow's center. Functionally, the rigging serves to secure the 6 lead barges as an independent unit to the remainder of the tow. The rigging at each coupling point consists of a single cable, or jockey wire, joined by a ratchet used for tightening. Additionally, the outboard coupling points on the starboard and port sides are secured by a safety wire in order to afford added strength to these areas stressed during the steering of the vessel.

when injured was at his station and in the process of removing the starboard safety wire. Normally a cheater pipe [2] must be used by a deckhand to loosen a ratchet on a rigging at a coupling point. However, plaintiff testified that when he encountered the safety wire it was sufficiently slack so that he could loosen the ratchet by hand unaided by a cheater pipe. Plaintiff stated that the second cable, or jockey wire, which was rigged below the safety wire, was taut. Thus, plaintiff testified that he loosened the safety wire and was unwrapping it from the deck fittings when it became fouled on a timber head; and in attempting to pull it free, plaintiff fell and was injured.

We first consider plaintiff's claim that he was required to work in an unlit or inadequately lit area at the time of his injury. We are unpersuaded by plaintiff's contentions in this regard and find he has wholly failed to meet his burden of proof.

The clear weight of credible evidence indicates that at the time of plaintiff's injury his work area was brightly illuminated by mercury vapor floodlights adjacent to the tow along the "long wall"[3] of Lock 7. According to the evidence, floodlights are positioned at intervals of 50 feet along the long wall and short wall of Lock 7. In addition, there are lights at the outermost point of each wall. Each floodlight is mounted on a 30 foot pole which projects toward the center of the lock. Prentiss Williamson, the GREENVILLE's captain at the time of plaintiff's injury, as well as Roy Baudoin, the first mate, testified that the deckhands, including plaintiff, were specifically instructed not to remove any rigging at the break coupling until the head of the tow had passed the bullnose of the lock. Plaintiff conceded that he was so instructed and

frankly admitted on cross-examination that the head of the tow had indeed passed the bullnose before he began removing the safety wire.

The evidence is replete that once the head of the tow passes the bullnose, there is ample illumination from the floodlights for a deckhand to perform his tasks at the break coupling. Furthermore, the distance from the head of the tow to the break coupling was established by the evidence to be no more than 400 feet, whereas the long wall extends 600 feet beyond the bullnose. Simple arithmetic reveals that the break coupling had passed under 200 feet of floodlights on the long wall when plaintiff, as instructed, first removed the safety wire.

Ivy Wizer, a deckhand working on the tow at a point approximately 45 feet from plaintiff, testified by deposition that there was sufficient lighting from the lockwalls to work at the break coupling at the time plaintiff was injured.

Finally, plaintiff conceded that he had been issued a flashlight, which was in his possession at the time of his injury. Under the present facts, prior to the tow entering the lighted area of Lock 7, plaintiff was merely required to walk to his station at the break coupling, examine the work area and stand ready to remove the rigging. Unquestionably, a flashlight provided sufficient light to perform these simple chores. Once the head of the tow had reached and passed the bullnose and plaintiff was required to perform the actual work of removing the rigging, the floodlights from the lockwalls furnished plentiful light at the break coupling so that plaintiff could have safely discharged his duties unaided by a flashlight. On the issue of lighting, we are, therefore, unable to find defendant negligent or the vessel unseaworthy.

2. The cheater pipe is commonly 1½ to 2″ thick and 4′ long. It is placed over the handle of a ratchet to provide leverage in loosening the rigging.

3. The longer side of a lock chamber is called the long wall or land wall. It is approximately 1200 feet in length and extends 600 feet beyond the opposite side of the lock, called the short wall. The outermost point of the short wall is called the "bullnose".

We next consider plaintiff's claim that assuming arguendo sufficient illumination existed in the work area, some other member of the crew misplaced the cheater pipe on which plaintiff stepped, and negligently allowed it to remain on the deck in a hazardous position. Plaintiff asserts that such conduct, when coupled with defendant's failure to provide compartments, racks, or similar storage areas for cheater pipes, rendered the GREENVILLE and her appurtenances unseaworthy. Once again the question of negligence and unseaworthiness vel non turns on the facts surrounding plaintiff's accident, and, since there was no eyewitness to the accident, plaintiff's credibility.

█ After a careful examination of the evidence and reasonable inferences, we conclude that the sole proximate cause of plaintiff's injury was his own negligence. We reach this conclusion primarily because of the established and undisputed fact that plaintiff arrived at his work station at least 10 to 15 minutes prior to the accident. Since he had no other duty to perform during this interval, we believe plaintiff had ample opportunity to examine the area at the starboard side of the break coupling where he was to begin removing the rigging.

Roy Baudoin, the mate, testified that he had routinely inspected the rigging and the general area at the break coupling twice after the GREENVILLE and her tow had traversed Lock 8, the lock encountered immediately prior to Lock 7. He did not observe during either inspection an unattended cheater pipe lying on the deck at the break coupling. Also, substantial evidence indicated that a deckhand would most likely have had to use a cheater pipe to loosen and tighten the ratchets on the rigging during double tripping, from which defendant suggests that plaintiff himself

had brought the pipe to the starboard side of the coupling to aid in his work; and, when the fouled wire on which plaintiff was pulling suddenly came loose, plaintiff stepped on the pipe where he had himself placed it. Defendant's hypothesis is logical and highly persuasive from the standpoint of practicality. But assuming that plaintiff did not place the pipe in its position on the deck, we believe its presence would have been readily apparent to plaintiff during the period prior to the accident if he had exercised reasonable prudence for his own safety.

There are additional considerations which lead us to this view. The captain and first mate affirmed that when cheater pipes are not in use they are stored in the tow knees of the GREENVILLE. During double tripping, however, the testimony shows that it was not only probable but absolutely essential for cheater pipes to be at the break coupling to aid deckhands in loosening and tightening ratchets. Thus, when the tow was in the vicinity of a lock, plaintiff should have been aware of the presence of a nearby pipe. Indeed, the demonstrative evidence of a layout of the starboard break coupling in the courtroom positioned the cheater pipe only 18 to 24″ from the point at which plaintiff knelt to loosen the ratchet on the safety wire. Therefore, we find that the pipe was readily apparent and plaintiff knew or should have known of its location.

Plaintiff testified that as he pulled on the tangled wire he was cognizant that there were wires and a loose ratchet lying on the deck behind him, and that he had placed on the deck the ratchet upon which he fell. Plaintiff's obvious purpose for pulling on the fouled wire [4] was to free it from its entanglement. Thus, we reach the unavoidable conclusion that as plaintiff pulled on the wire he utterly disregarded the danger of mo-

---

4. Neither plaintiff's pleadings nor proof has sought to establish that the mere fouling of the wire itself was an unseaworthy condition. Rather, plaintiff concedes that such incidents are common occurrences on barge rigging and do not arise because of unseaworthiness.

mentum which might well cause him to step or go backward onto precarious objects which he knew or should have known were lying on the deck behind him.

██ Although a ship owner owes a seaman an absolute, continuing, and nondelegable duty to provide a safe and seaworthy vessel, seaworthiness is not an inflexible or impractical concept requiring perfection. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The doctrine justifiably requires that a vessel and her equipment be reasonably fit for their intended use, Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955), so that seamen are protected from dangerous conditions beyond their control. Little v. Green, 428 F.2d 1061 (5 Cir. 1970), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384. Thus, a ship owner is not required to provide a vessel or equipment which are accident free. Wilson v. Societa Italiana De Armamento (Sidarma), 279 F.Supp. 945 (E.D.La.1968). Indeed, in Massey v. Williams-McWilliams, Inc., 414 F.2d 675 (5 Cir. 1969), the Fifth Circuit recognized that there are inevitable hazards incident to the work of seamen which arise because of the nature of the work and not from negligence or unseaworthiness.

Within the factual context of the present case, plaintiff knew or should have known of the potential danger of pulling on a tangled wire while objects lay on the deck behind him. It was incumbent upon plaintiff to remove such objects prior to pulling on the wire, or to take such other appropriate action to avoid injury. The cases are legion which hold that an injured seaman may not recover for injuries occasioned solely because of his own negligence. We hold that the sole proximate cause of plaintiff's accident was his own negligence and his recovery on the issues of negligence and unseaworthiness is accordingly denied.

The remaining issue is plaintiff's claim to maintenance and cure payments and damages for defendant's failure to provide same. Defendant concedes that plaintiff was entitled to such payments at the time of his injury but urges that plaintiff refused free medical services, thereby waiving the right to maintenance and cure under general maritime law.

██ According to the evidence, defendant provided emergency care for plaintiff following the accident at St. Francis Hospital at La Crosse, Wisconsin. Although plaintiff voluntarily left the hospital against the recommendation of his physician and returned to his home in Greenville, Mississippi, we find that plaintiff's decision to leave was prompted solely by his concern for the welfare of his son who had been injured in Mississippi, and plaintiff's belief that his presence was necessary to secure hospitalization for his son. We are unable, therefore, to construe plaintiff's decision to return to Mississippi as a clear refusal of free medical treatment.

It is undisputed that a master's certificate to a public health hospital was neither tendered to the plaintiff nor requested by him. Instead, the defendant's practice was to provide local medical care for its injured crew members and thus enable them to remain at home, or in a local hospital. The version of events which ensued following plaintiff's return to Mississippi is sharply disputed, and arises out of a conversation between the plaintiff and Port Captain James Gilder at the defendant's office the morning after his arrival in Greenville. The port captain testified that he informed plaintiff that an appointment with a local physician for a physical examination would be arranged that afternoon, and subsequent treatment, if found to be necessary, would be provided by defendant. Plaintiff's testimony differed somewhat, indicating that Gilder told him he would make an appointment for medical examination by a company doctor, and, if found to be fit, plaintiff should report to work at 6 p. m. that day. Plaintiff admittedly did not return for the appointment or see any doctor

offered by defendant. Instead he proceeded to the office of a local attorney, who made an appointment for plaintiff with a private physician at Jackson, Mississippi. Plaintiff did not return to defendant's office until three weeks later, and then only to retrieve his personal effects. Once again the port captain asked plaintiff if he had seen a doctor for his back condition and plaintiff replied in the affirmative, stating that his attorney had engaged one for him. Plaintiff did not at that time request that defendant make further medical service available to him. No further contact was made by the plaintiff or his counsel seeking medical service until litigation was imminent.

Unquestionably, a seaman who unreasonably refuses free medical treatment proffered by a ship owner cannot seek private medical treatment and hold the ship owner liable for maintenance and cure. Plaintiff's position is that he did not construe defendant's actions as an offer of medical treatment, rather, plaintiff would be afforded a mere cursory examination and then required to do work which he was physically unable to perform. Defendant maintains that the port captain clearly offered the examination and, if necessary, medical treatment before requiring plaintiff to return to work, but plaintiff unequivocally refused both, preferring to terminate his employment and seek his own medical care. Thus, defendant contends that it could not be expected to do more.

■■ A master's duty to provide for maintenance and cure for an injured seaman arises independent of the master's liability for the injury itself. De Zon v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); Couts v. Erickson, 241 F.2d 499 (5 Cir. 1957), and doubts as to liability for maintenance and cure are to be resolved in favor of the injured seaman. As stated by the Supreme Court in Vaughan v. Atkinson, 369 U.S. 527, 531–532, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88, 92 (1962):

"Admiralty courts have been liberal in interpreting this duty [to provide maintenance and cure] 'for the benefit and protection of seamen who are its wards.' . . . We noted in Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 933, 934, 87 L. Ed. 1107, [1112,] that the shipowner's liability for maintenance and cure was among 'the most pervasive' of all and that it was not to be defeated by restrictive distinctions nor 'narrowly confined.' Id. [318 U.S.] at 735, 63 S.Ct. at 936. When there are ambiguities or doubts, they are [to be] resolved in favor of the seaman. Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503."

Therefore, absent sufficient evidence to rebut plaintiff's testimony, we would afford great weight to plaintiff's interpretation of defendant's proposal. A reasonably justified refusal should not defeat substantial rights for cure and maintenance.[5] Granted, however, that plaintiff was apprehensive about returning to work, we believe he should have submitted to an examination at defendant's expense, and no valid reason for not doing so appears from the evidence. If the evidence showed that the examination were clearly unsatisfactory and plaintiff were indeed ordered to work without proper treatment, he may well have been justified in seeking medical treatment independent from that offered by his employer. Mere apprehension that medical care may not be satisfactory, as distinguished from dissatisfaction resulting from clearly inadequate medical treatment furnished by the employer, may not excuse an injured seaman from the consequences of declining, at his peril, the employer's reasonable tender of care. Here, it is plain that the plaintiff's course of action was not founded on fac-

---

5. Courts will not inexorably apply the rule that a seaman's refusal to submit to free medical care forfeits the right to maintenance and cure. Luth v. Palmer Shipping Corp., 210 F.2d 224 (3 Cir. 1954).

tually-based dissatisfaction with the medical service offered, or on other excusable and exceptional circumstances, nor was it brought about by defendant's failure to act timely.

There are cases which uphold the seaman's right to recover for maintenance and cure notwithstanding the injured seaman's refusal to accept the care provided by the employer, but they are distinguishable for in such cases the facts establish that the medical service offered by the employer was either clearly inadequate or that other reasonable grounds existed for refusing it. Sobosle v. United States Steel Corp., 359 F.2d 7 (3 Cir. 1966) (seaman's failure to submit to recommended medical treatment held not to be an unreasonable refusal of free medical treatment where personal difficulties, neuroses and anxieties deprived seaman of normal faculties); Luth v. Palmer Shipping Corp., 210 F.2d 224 (3 Cir. 1954) (libellant's failure to avail himself of surgery held justified absent ship owner's assurance that maintenance would be paid during convalescence); Murphy v. American Barge Line Co., 169 F.2d 61 (3 Cir. 1948), cert. denied, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (seaman's failure to enter a distant hospital for treatment held justified where ship owner refused to provide transportation); Murphy v. Panoceanic Faith, 241 F.Supp. 540 (E. D.La.1965) (seaman's refusal to submit to continued treatment at Public Health Service Hospital held not unreasonable where hospital had incorrectly diagnosed and failed to cure seaman's injured knee). In no case has the injured seaman's whim or caprice been accepted as a bona fide cause for declining medical services provided by the ship owner.

■ In declining an award of maintenance and cure, we are not unmindful of the fact that plaintiff sustained a severe back injury requiring several subsequent periods of hospitalization and ultimate back surgery, for which he incurred expenses of $3,143.41, and that he has sustained a permanent partial disability. Plaintiff was nevertheless paid mainte-

nance of $1,488 for 248 days at a daily rate of $6 following the termination of his employment, and full wages to the end of his month's employment. While plaintiff's maximum recovery required a longer period of time, extending until January 1, 1973, his claim for additional maintenance is defeated by his unexcused failure to accept the medical care which was offered by defendant. Although admiralty courts liberally protect the rights of seamen in the exercise of their calling and recognize the absolute duty of the ship owner to cure and maintain the seaman during the period of his convalescence from injuries sustained in the course of maritime employment, we are nevertheless required here to deny such an award because of the willingness of the employer to discharge its obligation and the plaintiff's unjustified failure to respond reasonably thereto.

Accordingly, an order dismissing the complaint with prejudice shall be entered.