Robert TURNER

v.

INLAND TUGS CO., et al.

Civ. A. No. 87–2728.

United States District Court,
E.D. Louisiana.

April 8, 1988.

On Motion for Final Judgment N.O.V.
June 3, 1988.

---

Patrick D. McArdle and Laura E. Fahy, New Orleans, La., for plaintiff.

Fred E. Salley and Lee M. Peacocke, Salley & Associates, New Orleans, La., for defendants.

### Order and Reasons

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court on the parties' memoranda on the proposed form of final judgment to be entered on the jury's verdict.

Only three issues are disputed: (1) whether judgment should include both the $7,660 for past maintenance and the $31,-000 for past lost income or instead only the $31,000 as the award for both past lost income and past maintenance, (2) whether the award for past maintenance and cure (and possibly past lost income) should include pre-judgment interest, and (3) whether the judgment should be reduced by $600 for defendants' loan to plaintiff.

### I.

The jury determined, among other things, that plaintiff was entitled to maintenance and cure, that he had not yet reached maximum medical cure, and that his past lost income amounted to $31,000. Based on all counsel's written stipulation in the pre-trial order that Inland Tugs stopped paying plaintiff maintenance and cure on December 15, 1986, their apparent agreement that it started paying him maintenance again on January 14, 1988, and their oral stipulation at the jury charge conference that maintenance should be awarded at a rate of $20/day, the parties agree that the amount for maintenance equals $7,660.00.

All counsel further agreed at the charge conference that any award for past lost income would cover and include any award for past maintenance. On the one hand, plaintiff's counsel now state that their agreement on this point was "based on the defendants' representations that this was the law" and cite *Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191 (5th Cir.1982), and *Morel v. Sabine Towing and Transportation Co.*, 669 F.2d 345 (5th Cir.1982) for support that both the maintenance award and the past lost income award should be permitted. On the other hand, defendants' counsel now suggest that because of this agreement, they did not object to the Court's failure to include their proposed Jury Interrogatory Nos. 19–20:

19. According to the evidence in this case, if the plaintiff had not been paid maintenance to which he is entitled, please state the amount of unpaid maintenance, in dollars, which the plaintiff is entitled to receive.

$_____

20. According to the evidence in this case, if the plaintiff has received maintenance payments from his employer, please state the amount of those payments to the plaintiff.

$_____

Further, they cite *Wood v. Diamond M Drilling Co.*, 691 F.2d 1165 (5th Cir.1982) for support that the maintenance award should not be made in addition to the past lost income award.

Without the oral agreement of counsel at the charge conference, plaintiff would be entitled to the two separate awards. First, to quote *Wood*, which upheld the separate awards of past maintenance and past wages, "we find no interrogatory, objection to the charge, or argument to the jury that suggests duplication. Absent this, we hold that the award for maintenance and cure is not duplicated by the award for lost wages." *Id.* at 1171. Despite defendants' suggestion, their two proposed Jury Interrogatories do not address duplication of award *between past maintenance and past lost income.* Second, *Ceja* is binding precedent on this Court, even if in defendants' opinion *Ceja* relies on a "fundamental flaw" about earned and unearned wages.

But the oral agreement changes the story. By now arguing that the agreement should not be followed, plaintiff's counsel argue a position that would severely prejudice defendants, for without the agreement, defendants' counsel could have asked the Court to include instructions on this point and have argued to the jury against the dangers of any double recovery. If plaintiff's counsel disagreed with defendants' counsel's understanding of the law, their time to object was before the agreement was made, not after the verdict was rendered. Equity restrains this Court from accepting plaintiff's late found theory.

Accordingly, no award for past maintenance should be made in addition to the $31,000 award for past lost income.

## II.

■ Plaintiff seeks pre-judgment interest on his award for maintenance and cure (and by his same arguments also for past lost income); defendants oppose it. While the issue is moot as to maintenance, it is not as to cure (and past lost income).

Plaintiff submitted no proposed jury interrogatory form, and defendants' pro-posed jury interrogatory form included no question on whether pre-judgment interest should be awarded on any or all of the award. Neither parties' proposed jury charges addressed this issue. At the charge conference, counsel did not request any charge or interrogatory on this issue; further, no objection was entered onto the record as to this issue.

In the recent opinion *Morales v. Garijak, Inc.*, Judge Rubin has held:

Although the maintenance and cure claim was tried to the jury, the factual question of entitlement to prejudgment interest was not submitted to the jury. Consequently, the district court did not have the authority to award such interest, and its award must therefore be vacated.

829 F.2d 1355, 1361 (5th Cir.1987) (citing *Havis v. Petroleum Helicopters, Inc.*, 664 F.2d 54 (5th Cir.1981)). Recognizing that this Court is bound by *Morales*, plaintiff appears only to raise the issue to preserve the issue for any appeal.

Bound by *Morales*, this Court may not award pre-judgment interest on past maintenance and cure (or on past lost income).

## III.

■ Defendants are requesting that their $600 counterclaim for their uncontested loan to plaintiff be subtracted from the final damage award. Plaintiff objects "because the jury did not award it ... [and] because there was no motion for directed verdict made on the issue."

The pre-trial order, signed by all counsel, includes the following two items under the hearing "Uncontested Material Facts":

h. The plaintiff received a loan in the amount of $600.00 from Inland Tugs.

i. The plaintiff has not repaid Inland Tugs any amount for any indebtedness owed to Inland Tugs ....

Because all counsel agreed that plaintiff owed $600 to defendant Inland Tugs, the interests of justice would hardly be served by requiring the parties to present evidence on this issue and to have the jury make a finding on this issue. *See generally* F.R.

Civ.P. 1, 16(c)(4). It is in this same vein that no jury finding on a daily figure for maintenance was sought, all counsel having agreed to a $20/day figure for maintenance (to cover the off-chance that the jury would find no negligence and no unseaworthiness).

Accordingly, $600 shall be deducted from plaintiff's jury award.

### IV.

In conclusion, the judgment should be calculated as follows:

| | |
|---|---|
| Past lost income: | $ 31,000.00 |
| Future lost income: | 195,000.00 |
| Past and future pain and suffering and mental anguish: | 75,000.00 |
| SUBTOTAL | $301,000.00 |
| Less 10% contributory negligence: | < 30,100.00 > |
| ADJUSTED DAMAGES | $270,900.00 |
| Cure: | 19,000.00 |
| Punitive Damages: | 50,000.00 |
| SUBTOTAL | $339,900.00 |
| Less $600 loan set-off: | < 600.00 > |
| GRAND TOTAL Defendants owe Plaintiff | $339,300.00 |

The Clerk of Court is directed to enter judgment accordingly.

### On Motion For Judgment N.O.V.

This matter came before the Court on May 18, 1988 for hearing on defendants' motion for judgment in accordance with motion for directed verdict and alternatively for new trial and/or for remittitur. At the hearing, the Court explicitly DENIED the motions for JNOV, remittitur, and new trial and implicitly DISMISSED AS MOOT the motion for a new trial in the event a JNOV be reversed on appeal. The Court now gives the reasons for its ruling.

This is a Jones Act/unseaworthiness case. On April 11, 1988, upon the jury's verdict of March 18, 1988, the Court entered judgment for $339,300 in solido against both defendants, Inland Tugs Co. ("Inland Tugs") and American Commercial Barge Lines a/k/a American Commercial Lines, Inc. ("ACBL"). By motion timely filed on April 21, 1988, defendants now raise a host of reasons why a JNOV, remittitur, or new trial should be granted. Because not one of their reasons is valid, the Court must reject their request.

### I.

Defendants seek a JNOV on five separate grounds. When a jury returns a verdict in favor of a seaman such as plaintiff, a JNOV may be granted only where there is a complete absence of probative facts to support the verdict. *Thornton v. Gulf Fleet Marine Corp.*, 752 F.2d 1074, 1076 (5th Cir.1985).

As explained below, each of defendants' grounds is invalid. Thus, the Court must deny their motion for JNOV and dismiss as moot their motion for a new trial in the event a JNOV be reversed on appeal.

### A.

■ In response to Jury Interrogatory No. 10, the jury found that plaintiff had not reached maximum medical cure.

Defendants assert that defendant Inland Tugs, plaintiff's Jones Act employer, is not obligated to pay maintenance and cure ("M & C") after January 25, 1988. As support, they argue that plaintiff's treating physician, Dr. John J. Watermeier, testified at trial that plaintiff needed no further medical treatment as of January 25, 1988. *See Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110, 1116 (5th Cir.1984).

Defendants misconstrue the evidence presented. First, Dr. Watermeier never testified that plaintiff needed no further medical treatment (i.e., that he had reached maximum medical cure); he merely testified that he released plaintiff from his care. Second, and more importantly, defendants' own medical expert, Dr. George R. Cary Jr., testified that he believed plaintiff needed further medical care.

The jury apparently chose to believe Dr. Cary, whose testimony was not refuted by Dr. Watermeier. But even if Dr. Watermeier had testified as defendants characterize his testimony, such would be insufficient to mandate a JNOV on this issue, for Dr. Cary's testimony alone creates enough of an evidentiary basis to support the jury's finding.

Finally, defendants' argument is largely moot. By agreement of counsel at the charge conference during the trial, any

award for past lost income would cover and include any award for past maintenance; thus, no separate award was made for both past lost income and past maintenance. *See* Order and Reasons of April 8, 1988, at 2–3. Further, no award was made for future medical expenses. As long as the jury's finding of either Jones Act liability against Inland Tugs *or* unseaworthiness liability against either Inland Tugs *or* ACBL is permitted to stand, any erroneous finding by the jury on this issue is harmless; as shown in Parts I(C)–(E) below, the jury's findings are not only supported on any one of these three points of liability, but also on all three.

### B.

In response to Jury Interrogatory Nos. 13–15, the jury found that plaintiff had "made a proper demand on defendant Inland Tugs for it to pay him maintenance and cure," that defendant Inland Tugs failed "to pay adequate maintenance and cure in a manner that was arbitrary, capricious, or with callous disregard for [plaintiff]'s claim for maintenance and cure," and found that plaintiff should be awarded $50,000 "for defendant Inland Tugs Company's failure to pay adequate maintenance and cure."

Defendants assert that Inland Tugs is not liable for the failure to pay plaintiff M & C. They argue (1) that plaintiff was entitled to no M & C once he stopped seeing Dr. Theodore J. Bender Jr. and went to a doctor of his own choosing (Dr. Watermeier) and (2) that Inland Tugs did not know plaintiff was seeing this new doctor until August 1987, in response to defendants' document request, and received no further medical information on plaintiff until January 1988.

Immediately following the accident, which occurred on April 15, 1986, plaintiff

was being treated by Dr. Bender. During this time, Inland Tugs was paying plaintiff his cure as well as $20/day for his maintenance. In December 1986, upon plaintiff's decision to stop seeing Dr. Bender, Inland Tugs stopped its payments to plaintiff.[1] On January 15, 1987, plaintiff's counsel wrote a letter to Robert Aldrich of Inland Tugs; counsel advised that plaintiff had seen Dr. Watermeier and formally demanded that Inland Tugs resume plaintiff's maintenance payments. *See* Exh. P–7. Mr. Aldrich's reply letter of January 26, 1987 on Inland Tugs stationery shows that Inland Tugs received counsel's letter; in this reply letter, Mr. Aldrich stated, without explanation, that Inland Tugs would only pay for medical attention provided by Dr. Bender. *See* Exh. P–8. In his second cause of action asserted in his complaint, filed on June 10, 1987, plaintiff specifically alleged that he had been "examined and treated by various physicians in Louisiana for the injuries" from his accident and that Inland Tugs had not met his demands to resume payment of M & C. Defendants waited until January 26, 1988 (i.e., over year after being advised of Dr. Watermeier's care, over seven months after the lawsuit was filed, a few days after the discovery and expert report deadline that had already once been extended at defendants' request, only four weeks before the pre-trial conference date, and less than seven weeks before the trial date) to have plaintiff examined by their medical expert, Dr. Cary. Upon Dr. Cary's examination, wherein he determined that plaintiff had not reached maximum medical cure, Inland Tugs resumed its $20/day maintenance payments to plaintiff.

 As for their first argument, defendants misconstrue the law. A Jones Act employer cannot demand that an injured seaman see solely a doctor of the employer's choosing; the law permits the

---

**1.** The exact date is uncertain. First, defendants' Exhibit W (Inland Tugs' maintenance checks to plaintiff) suggests that Inland Tugs last paid plaintiff maintenance on November 21, 1986, effective for the period ending November 13, 1986. Second, in the Pre-Trial Order, all counsel stipulated, in Paragraph (f) under the heading "Uncontested Material Facts," that plaintiff

received maintenance payments through December 26, 1986. Finally, paragraph (i) thereunder states that Inland Tugs has not "paid the plaintiff any maintenance and cure since December 15, 1986." The exact date is largely immaterial, it at least not being disputed that Inland Tugs stopped payments to plaintiff in 1986.

seaman to see the doctor of his choice, at least to the extent that his doctor costs the employer no more than another doctor of its choosing would. While a seaman's claim for cure may be subject to mitigation, it remains the employer's burden to prove that the seaman's doctor provided unnecessary treatment or charged higher fees than the employer's doctor. *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129 (5th Cir. Unit A 1981). With the days of the Public Health Service Hospitals (wherein the U.S. Government provided free medical care to injured seamen) gone by virtue of the Omnibus Budget Reconciliation Act, Pub.L. No. 97–35, § 986, 95 Stat. 357, 603, so too is gone, to a large extent, the force of *Kossick v. United Fruit Co.*, 365 U.S. 731, 737, 81 S.Ct. 886, 891, 6 L.Ed.2d 56 (1961) (a seaman who without just cause refused a master's certificate for admittance to a public hospital or the free treatment to which the certificate entitled him was not entitled to further M & C). *See generally* N. Healy & D. Sharpe, *Admiralty: Cases and Materials* 453 (2d ed. 1986). The Court cannot say that the jury's finding on M & C lacked foundation.

■ As to the second argument, the Court agrees with defendants that Inland Tugs is entitled to investigate and require corroboration of plaintiff's claim for M & C. *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1359 n. 3 (5th Cir.1987). Defendants, however, completely misstate and mischaracterize the evidence on this issue. By counsel's letter of January 15, 1987, Inland Tugs was formally put on notice of plaintiff's continuing claim for M & C. Inland Tugs' excuse for discontinuing plaintiff's M & C payments was because plaintiff changed doctors—not an excuse permitted under *Caulfield.* Evidently, Inland Tugs made no attempt to investigate plaintiff's condition until after he filed in lawsuit in mid–1987. Further, Inland Tugs waited over an entire year to seek independent medical advice on plaintiff's condition—advice that turned out to suggest that indeed plaintiff had not reached maximum medical cure—and did not pay plaintiff M & C during that period.

In sum, the jury could easily have found that Inland Tugs' failure to pay M & C for over a year had been arbitrary and capricious and that punitive damages for such behavior were in order.

### C.

■ In response to Jury Interrogatory No. 3, the jury found Inland Tugs liable to plaintiff under the Jones Act.

Defendants assert that plaintiff did not establish that Inland Tugs was at fault for plaintiff's accident. The jury was properly instructed that plaintiff need only prove slight negligence on Inland Tugs' part. Defendants misstate Inland Tugs' duty. Contrary to defendants' position, *Perry v. Morgan Guaranty Trust Co. of New York*, 528 F.2d 1378, 1380 (5th Cir.1976) does not mandate judgment for defendant whenever it lacks knowledge of a problem creating a dangerous condition; such lack of knowledge is a sufficient defense only when, in the jury's opinion, the employer has exercised due care under the circumstances. In other words, the standard of care is not what the employer subjectively knew, but rather what it objectively knew or should have known. The jury obviously believed that Inland Tugs failed to provide plaintiff with a safe place to work and could have inspected the barges prior to having its crew work on them.

Defendants cite three cases concerning flashlights. *See Theodories v. Hercules Navigation Co.*, 448 F.2d 701, 705 (5th Cir.1971); *Valentine v. St. Louis Ship Building Co.*, 620 F.Supp. 1480, 1483 (E.D. Mo.1985), *aff'd without published opinion*, 802 F.2d 464 (8th Cir.1986); *Oswalt v. Williamson Towing Co.*, 357 F.Supp. 304, 307 (N.D.Miss.1973), *aff'd on this point and rev'd on other points*, 488 F.2d 51, 53 (5th Cir.1974). These cases, however, do not apply to the instant facts. Unlike *Theodories* and *Valentine*, "[t]he overwhelming weight of the testimony [did not] establish[ ] that it [the lighting] *was* adequate." *Theodories*, 448 F.2d at 705. Unlike *Oswalt*, plaintiff did not refuse to use a flashlight given to him. As plaintiff's counsel explained in his brief:

[T]he jury, using common sense, must have realized that if [plaintiff] had one hand for the vessel and one hand for the wire he was carrying, then there was no hand available for the flashlight. They also apparently didn't believe defendants' witness when he demonstrated how he thought [plaintiff] could have carried the flashlight and the wire.

At the motion hearing, defense counsel argued that plaintiff did not establish that spotlights would have been feasible to light the barge on which plaintiff fell and suggested—though without any supporting evidence or authority—that such spotlights could have been dangerous. Counsel's argument is too little, too late. Plaintiff's burden is not to show what defendant could have done, but is merely to show what defendant did do was insufficient. To quote defendants' own brief, "the testimony of C.R. Davenport [was] that there was inadequate lighting on the tow."

Finally, defendants ignore plaintiff's testimony that he tripped on a dent on the barge. Solely based on this evidence and notwithstanding whatever the lighting was, the jury could have properly concluded that Inland Tugs was negligent by not having inspected the barge prior to its having its crew do work that often deprived a crewmember the opportunity to watch his every step.

In sum, there is more than ample evidence from which the jury could have found slight negligence on Inland Tugs' part.

### D.

In response to Jury Interrogatory No. 5, the jury found that Inland Tugs was "the owner pro hac vice of the barge on which plaintiff was injured."

Defendants assert that the sole evidence about the barge's status was its being in the tow of Inland Tugs' tug the M/V CHARLES E. PETER and that such evidence is insufficient to establish ownership pro hac vice. Again, defendants mischaracterize the evidence and miscite the law.

Defendants appear not to dispute the Court's charge to the jury on finding ownership pro hac vice:

An owner pro hac vice is one who has possession, command and complete control of the navigation of a vessel, and who mans, supplies, and maintains the vessel while it is in its possession.

*See* Jury Charge at 10. There was ample evidence to support the jury's finding. The tug's deck log lists all the barges in its possession and control on the day of the accident. *See* Exh. P–5. And the jury could reasonably have inferred from the testimony of plaintiff, among other persons, that Inland Tugs was exercising complete command and control over these barges in its possession. Finally, it was undisputed that the tug's crewmembers were the persons to tend to the barges while in tow.

As support, defendants cite *Ducote v. International Operating Co. of Louisiana,* 678 F.2d 543 (5th Cir.1982) (in a § 905(b) case, affirming summary judgment that defendant was no owner pro hac vice where the true owner and the defendant were in a ship owner/ship repairer relationship). Possessing far more incidents of ownership than the defendant in *Ducote,* Inland Tugs is more like the defendants in the cases distinguished in *Ducote. Id.* at 546 n. 2 (distinguishing *Eskine v. United Barge Co.,* 484 F.2d 1194 (5th Cir.1973) (tug owner held to be owner pro hac vice of barge it was towing in its complete control) and *Griffith v. Wheeling–Pittsburgh Steel Corp.,* 610 F.2d 116, 127–128 (3d Cir.1979) (barge incorporated into owner pro hac vice's coal fleet and put to commercial use), *vacated mem.,* 451 U.S. 965, 101 S.Ct. 2038, 68 L.Ed.2d 343 (1981), *reinstated,* 657 F.2d 25 (3d Cir.1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982)).

Defendants cite *St. Paul Fire & Marine Insurance Co. v. Vest Transportation Co.,* 666 F.2d 932, 939 (5th Cir.1982) for the proposition that Inland Tugs must pay charter hire to the barge owner in order to create ownership pro hac vice. Defendants misrepresent the holding in *St. Paul.* The case did not hold that payment of charter

hire was necessary in order to find ownership pro hac vice; what it said was there must be a "complete transfer of possession, command, and navigation." *See id.* at 939. Besides, *St. Paul* did not concern personal injury, but an insurance/charterparty question. Further, the tugboat owner in *St. Paul* was found to be the owner pro hac vice. *See id.*

Finally, any alleged error by the jury on this issue is harmless inasmuch as the jury's verdict could wholly stand on the Jones Act finding alone. *See supra* Part I(C).

### E.

■ In response to Jury Interrogatory No. 4, the jury found that ACBL did "own the barge on which plaintiff was injured."

Defendants assert that "there was no testimony as to the identity of the vessel or the owner." Again, defendants are in gross error. Plaintiff specifically testified that he saw the letters "ACBL" on the side of the barge. The Vessel Employee Personal Injury Report admitted into evidence includes the following: "10. Name of boat or number of barge on which accident occurred *ACBL–3051*." *See* Exh. P–3. Further, the deck logs admitted into evidence appear to indicate that the tug had no barges in its tow other than ACBL barges. *See* Exh. P–5.

The fact that plaintiff waited a day to report his injury, *see* Exh. P–3, or even two weeks, *see* Defendants' Memorandum at 9, goes to the credibility of his testimony and does not mandate a finding, or even a presumption, that ownership is not established. The fact that ACBL's barge did not have a catchy name for plaintiff to remember in full will not save ACBL, as long as plaintiff was able to identify enough about the barge to establish that it belonged to ACBL. Significantly, defendants cite no case holding that the *exact* identity of a vessel is required beyond mere identification showing that the defendant owned the vessel.

### II.

Defendants seek a new trial and/or remittitur on nine grounds. The Court is called upon to determine whether the verdict is excessive or contrary to the weight of the evidence or has resulted in a miscarriage of justice. *Pinner v. Schmidt,* 617 F.Supp. 342, 345 (E.D.La.1985), *aff'd on this point,* 805 F.2d 1258, 1262 (5th Cir. 1986), *certs. denied,* —— U.S. ——, ——, 107 S.Ct. 3267, 3276, 97 L.Ed.2d 766, 780 (1987). Upon viewing all the evidence, determining the fairness of the trial, and the reliability of the jury's verdict, the Court finds none of the nine grounds valid. Accordingly, the Court must deny the motions for a new trial and/or remittitur.

### A.

■ Defendants assert that the jury's responses to Jury Interrogatories Nos. 4 and 5 (finding ACBL to be the barge owner and Inland Tugs to be the barge owner pro hac vice) were inconsistent and irreconcilable. Specifically, without supporting authority, they assert that it is inconsistent to find more than one person to be a barge's owner for seaworthy purposes. Defendants are, in a word, wrong. *See, e.g., Griffith,* 610 F.2d 116 (finding that barge owner and tug owner (as barge owner pro hac vice) could both be liable to plaintiff for negligence). As explained in Parts I(D)–(E) above, the jury could properly have found both defendants to be the barge owners for seaworthiness purposes.

### B.

In response to Jury Interrogatory No. 9, the jury found that plaintiff should recover $195,000 for future lost income.

■ Defendants seek a new trial or at least a remittitur on this issue. Defendants correctly state that the proper base from which to determine plaintiff's future lost wages is plaintiff's gross earnings at the time of the accident, and not his average wage over an extended period of time or even the average wage of any deckhand (in either the shipping industry in general or at Inland Tugs in specific) at the time of the accident or over an extended period of

time. *E.g., Hernandez v. M/V RAJAAN,* 841 F.2d 582, 587–88 (5th Cir.1988).

Defendants assert that plaintiff's economic expert, Melvin Wolfson, used the wrong base figure. *See* Exh. A to Defendants' Motion in Limine, Record Doc. 52 (Wolfson's report). They argue that he should have used $15,500 (according to defendants, the amount plaintiff and an Inland Tugs representative each testified that plaintiff had been making per year) [2] instead of $20,470 as the base figure. Defendants' argument belies the rule of law they urge: they seek a base figure of plaintiff's *average* wages. This observation aside, the Court finds the second figure to be supported (even assuming Wolfson's method of calculation to be erroneous); as defense counsel admitted at the motion hearing, plaintiff had earned around $7300 in the four months he had worked in 1986; it takes no expert to triple $7300 to come up with over $20,000/year as plaintiff's annualized gross earnings *at the time of his accident.*

■ Finally, any alleged error on the part of plaintiff's expert was harmless. For the jury apparently agreed with defendants' expert witness, and not plaintiff's. Their expert, Kenneth Boudreaux, calculated $194,090.75 as plaintiff's future lost income—a difference of less than $1000 from the jury's award. If defendants' expert, for some unexplained reason, used improper figures as well (as counsel suggested at the motion hearing), then this Court cannot remedy defendants' unsuccessful trial tactic by permitting them to re-try this issue.

### C.

■ Defendants argue that the issue of Inland Tug's ownership pro hac vice was unfairly raised at trial.

Defense counsel asserts that he objected to the introduction of this issue at trial. The Court, however, does not recall him so objecting at trial and specifically remembers his not objecting thereto at the charge conference. If anyone should have been surprised at having to litigate this issue, it is plaintiff. Further, any alleged error would, in any event, be harmless inasmuch as the jury also found Jones Act liability on Inland Tug's part.

### D.

■ Defendants object to the Court's refusal to let their medical expert, Dr. Cary, testify beyond the scope of his expert report. Specifically, they object to his not having had the opportunity to address plaintiff's alleged pre-existing injuries in light of the information they received in March 1988 from Drs. Edmond Henson and Thomas Dempsey.

Defendants waited too long to complain about the need for their expert to supplement his report. Both Drs. Henson and Dempsey were listed on plaintiff's witness list timely filed on December 22, 1987 and in his August 1987 response to defendants' July 1987 interrogatories. On unopposed motion filed by defendants on November 20, 1987 and granted on November 23, 1987, the Court extended the expert cut-off dates (to 12/24/87 for plaintiff and to 1/22/88 for defendants) on the condition that the extension would not affect the trial date. Further, according to documents defendants filed in connection with their motion for trial continuance, defense counsel had authorization forms from plaintiff to allow defendants to obtain medical records directly from plaintiff's doctors, but waited until the end of December 1987 to send these forms to Drs. Dempsey and Henson. *See* Exhs. 1 and 3 to Exh. D to Defendant's Motion, Record Doc. 38.

Having known about these doctors since August 1987, defense counsel could have deposed them, and asked for their medical records, months before the trial date; counsel cannot now complain for having waited until the last minute to act. Further, defendants were never precluded from asking plaintiff at his deposition about any pre-existing injuries he might have ever suffered.

**2.** The Court notes that plaintiff's tax returns for 1983, 1984, and 1985 reveal that plaintiff's annual gross wage income exceeded $20,000 for each of these years. *See* Exh. P–1.

### E.

Defendants now object to the introduction at trial of Exh. P–9, certain nurse's notes, on the grounds of hearsay.

First, defendants do not assert that they objected to this exhibit at trial. It is well established that a party waives a hearsay objection if he does not timely raise the objection at trial. F.R.Ev. 103(a)(1); *see also Olender v. United States*, 237 F.2d 859, 866 (9th Cir.1956) (hearsay objection not raised at trial cannot be urged on appeal as reversible error), *cert. denied*, 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957); *cf. Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1458 (5th Cir.1987) ("defenses not raised or argued at trial are ordinarily waived by the parties failing to raise them").

Second, these nurse's notes, like most hospital records, come within the business-records exception to the hearsay rule. *See* F.R.Ev. 803(6); *United States v. Sackett*, 598 F.2d 739, 742 (2d Cir.1979).

### F.

Defendants next make certain opaque objections to the deposition testimony of Dr. Henson.

First, defendants did not make any written objection to this testimony in accordance with Paragraph 1 of the Court's standard Trial Preparation Order entered February 24, 1988 (ordering strict compliance with Section IX, Paragraph 11(a) of the Court's standard Uniform Pre–Trial Notice mailed to all counsel with the Court's standard scheduling order on August 19, 1987 ("As to all objections to the testimony which cannot be amicably resolved, the parties shall deliver to the Court, not less than three days prior to trial, a statement identifying the portions objected to, and the grounds therefor.")).

Second, it was defense counsel who was questioning Dr. Henson; having asked the doctor to speculate, he cannot now complain because he did not like Dr. Henson's reply.

Finally, and most importantly, the Court does not consider the doctor's few, confusing sentences to be unduly prejudicial in light of either the entire trial or just the single deposition.

### G.

Defendants argue that the jury's finding of 10% negligence on plaintiff's part was too low. On this issue, they seek a new trial and/or remittitur.

Allocation of fault is a question for the factfinder, and is reviewed under the *Boeing* "substantial evidence" standard. *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1092 (5th Cir.1988) (citing *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 166 (5th Cir.1979), *cert. denied sub nom. St. Paul Mercury Insurance Co. v. East West Towing Co.*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), and *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc)).

There was ample evidence for the jury to have concluded that plaintiff was only 10% negligent. The jury obviously believed that the bulk of the fault in this case was defendants'—that the plaintiff's negligence in not looking where he was going was relatively small considering that at the time he fell, he needed one hand to hold on the barge and the other to hold the 70–pound wire roll on his shoulder as instructed and had no extra hand to easily hold a flashlight. *Cf.* Part I(C) above.

### H.

Defendants assert that "[d]uring closing argument, counsel for plaintiff made several references to facts which were completely devoid of any evidentiary support." Specifically, they argue that plaintiff counsel's closing arguments were prejudicial when he mentioned (1) that Inland Tugs owned over 2000 barges and then asked how to punish it and (2) safety methods that Inland Tugs could have used.

First, the Court notes that defense counsel does not even allege to have made any objections at the closing argument. *See* Part II(E) above; *cf. also Mouton v. Tug IRONWORKER*, 811 F.2d 946, 948 (5th Cir.1987) (upon an objection, trial court can instruct jury to disregard improper re-

marks made at closing argument). Second, the reference to punishment was not improper insofar as plaintiff had a claim for punitive damages against Inland Tugs. Third, any misreference to Inland Tugs instead of to ACBL was hardly prejudicial, especially since, as defendants' own pleadings state, "Inland Tugs ... [is] a division of American Commercial Lines, Inc."[3] *See, e.g.,* Answer at 1, Record Doc. 3.

Finally, as to safety methods, there is no need for evidence, expert or otherwise, when a jury's common sense alone will do. The jury needed no evidence to show that additional lighting would alleviate problems of darkness. If defendants were concerned, they should have introduced proper evidence at trial. At the pretrial conference and in the pre-trial order, this Court was made aware of plaintiff's allegation of improper lighting; the Court must presume that defense counsel was well aware of this issue at least by the pre-trial conference and should have anticipated any need for evidence on this issue. *See also* Part I(C) above.

### I.

▮ Finally, defendants object to the Court's order concerning Larry Dotson, who had been the lead deckhand on the tugboat at the time of the accident. They argue that the Court's order "required defendants to shepherd Mr. Dotson through the Federal Court House in front of the Jurors until the plaintiff was ready to call the witness." This erroneous, inappropriate connotation of impropriety deserves special attention.

Because defendants wholly mischaracterize the Court's oral order in chambers, the Court must now elaborate on the order and its surrounding circumstances. Just before the jury selection was to begin on Monday morning, March 14, 1988, all counsel came into chambers to discuss a problem concerning Mr. Dotson. Defense counsel brought him to town for the trial and

had him stay at one of the downtown hotels the night before the trial. That Sunday, plaintiff's counsel tried to contact Mr. Dotson; the attempt was unsuccessful because defense counsel had directed the hotel not to let plaintiff's counsel speak with Mr. Dotson. Some time later that Sunday, in order to further keep plaintiff's counsel from speaking with Mr. Dotson, defense counsel then secretly transferred Mr. Dotson to another hotel. At the Monday morning conference in chambers, plaintiff's counsel complained, for he wanted to call Mr. Dotson as a witness in plaintiff's case. In light of defendants' having chosen to treat the witness as one within their sole power and control, the Court ordered that defendants produce the witness for plaintiff. In essence, the Court gave defendants two choices: either produce the witness or don't hinder plaintiff's counsel in trying to contact the witness. Defendants apparently preferred to keep the witness from plaintiff's counsel. Of course, the jury had no knowledge of these events. During the trial, witnesses remained in the hallway until called; when Mr. Dotson entered the Courtroom to take the witness stand, he entered like all other witnesses. There was no shepherding of Mr. Dotson in the Courtroom.

At the motion hearing, defense counsel indicated that he and his co-counsel felt compelled to lead Mr. Dotson around in the courthouse hallways and that at one time one of the jurors saw them so leading Mr. Dotson. Such witness hoarding was counsel's own making, and they cannot object to their own choice.

Defense counsel unabashedly stated that "plaintiff had no right to contact Mr. Dotson." Counsel is gravely mistaken about the law; as plaintiff's counsel stated, "[n]obody owns fact witnesses."

In concluding, the Court emphasizes that the jury had no knowledge of the Court's

---

**3.** If, as defendants' term "division" suggests, Inland Tugs is merely a part of ACBL and not even a subsidiary corporation of ACBL, the Court's skepticism of defendants' instant motion is even more well-founded. But whether Inland Tugs is a subsidiary, a division, a part, a section, or whatever of ACBL, the Court was singularly unimpressed with defense counsel's trial tactic of disputing ownership status.

order and thus could not have been improperly influenced by it.

### III.

For these reasons, on May 18, 1988, at the motion hearing, the Court DISMISSED AS MOOT defendants' motion for a new trial in the event the JNOV be reversed on appeal and in all other respects DENIED their motions.