712 So.2d 905 (1998)
Richard J. PARKS, Jr., et al., Plaintiff-Appellee,
v.
PINE BLUFF SAND & GRAVEL CO., Defendant-Appellant.
No. 97-682.
Court of Appeal of Louisiana, Third Circuit.
February 18, 1998.
*907 Jerold Edward Knoll, Marksville, Richard Joseph Arsenault, Alexandria, for Richard Joseph Parks, Jr., et al.
Rufus Carrollton Harris, III, J. Fredrick Kessenich, Alfred J. Rufty, Jr., Spiro J. Verras, New Orleans, for Pine Bluff Sand & Gravel Co.
Before COOKS, WOODARD and PICKETT, JJ.
WOODARD, Judge.
Richard J. Parks, Jr. (Parks) injured his back when he fell into the Red River from a floating pontoon pipeline while attempting to secure this floating structure to a wall in a lock on the river. At the time of his injury, he was employed by Pine Bluff Sand & Gravel Company (Pine Bluff). Parks brought this action under 46 U.S.C.App. Sec. 688, commonly referred to as the Jones Act, and general maritime law, pursuant to the "savings to suitors" clause against Pine Bluff. From a decision by the trial court in favor of Parks, Pine Bluff appealed. We affirm in part, reverse in part, and remand to the trial court for additional findings.

FACTS
On September 16, 1993, Parks was a Jones Act seaman, performing duties in the course and scope of his employment with Pine Bluff. At the time of his accident, he was twenty-two years old, married with one child. He had dropped out of school after completing the eighth grade and had been gainfully employed since the age of sixteen.
On the day of the accident, one of Pine Bluff's dredges, the M/V Dredge Butcher, and its crew, including Parks, was performing dredging operations on the Red River. These operations consisted of removing sand and silt from the river bottom and discharging it at a desired location through a floating pointoon pipeline connected directly to the dredge. The floating pipeline pontoons were constructed with a catwalk and handrails which ran along the top of each section of the floating pipeline. The dredging operations required passage through the John H. Over-ton Lock and Dam on the river.
In order to traverse the lock, the Captain, Clay Shill, directed Parks and other deck hands to dismantle the dredge's pipeline pontoon, and travel aboard the pipeline pontoon into the lock and secure it to the lock wall. This was not unusual for Parks. He had traveled aboard the pontoon pipeline on many occasions. It was commonplace to move the pontoon pipeline from one location to another this way.
The catwalk on the pipeline was equipped with cable handrails running along the top of each section of pipe. The handrails were provided to prevent crew members from falling into the water. As Parks attempted to throw a line around the bitt in the lock wall, he leaned against the cable handrail. The pipe stanchion supporting the handrail cable broke at the weld where the pipe stanchion joined the floating pontoon. Parks fell overboard, hitting the pipeline with his right side as he fell into the Red River. Ron Smith, one of Pine Bluff's boat operators, witnessed the accident from the wheelhouse of the M/V Captain Joe. He testified that Parks did absolutely nothing wrong to cause this accident. Moments after Parks fell overboard, he was immediately pulled from the water by his fellow deckhands.
The Captain, Clay Shill, told Parks to go to the engine room of the M/V Captain Joe to dry his clothes. Later, Parks returned to his duties and worked the remainder of the day. When he returned home that night he told his wife about the accident and complained of being stiff and sore. The following morning, he was not feeling any better. When he realized that his injury was not improving, he telephoned Pine Bluff's time keeper, Roger Cole, who told him that he needed to complete an accident report, which Parks did a couple of days later.
Immediately after the accident, Dr. Brian McCann of Marksville, Louisiana, Parks' *908 family physician, saw him. He diagnosed his condition as a muscle and ligament strain of the neck, shoulder, and back. When Parks complained of continued pain, Dr. McCann referred him to Dr. Robert Rivet, a neurosurgeon in Lafayette, Louisiana. Dr. Rivet concluded that Parks had sustained only soft issue injuries to his cervical and lumbar spine; however, a radiology report showed a diffused broad based annular disc bulge. Dr. Rivet also specifically noted that Parks exhibited bilateral muscle spasms. Based upon these objective conditions, he felt that Parks needed to be hospitalized for a myelogram and CT scan. He also referred him to Dr. Jerry Smith, a psychiatrist in Alexandria, Louisiana. Dr. James Domingue, a radiologist, reviewed Parks' CT scan and concurred with Dr. Rivet's opinion that the myelogram and CT scan were normal. Dr. William Brown of Alexandria, Louisiana, Pine Bluff's company physician, saw Parks and concluded that he had sustained no injury. Dr. Brown released him, without restrictions, from his care on November 1, 1993. In February 1994, after Dr. McCann was pressured by Dr. Brown, he, likewise, released Parks but testified that he could not return to work or to any type of unrestricted employment.
In April 1994, Dr. Bruce Razza, an orthopaedic surgeon in New Orleans, Louisiana, saw Parks and diagnosed his condition as a spine segmental instability, which is a functional problem with the disc not providing a good supporting connection between the two bones. Dr. Razza opined that this was likely associated with an impaired disc function at L4/5 and that the disc was not acting like a good shock absorber and was allowing too much motion of the segment around the nerve. An MRI showed disc bulges at L4/5/S1, and there was clear clinical evidence of nerve root irritation. Dr. Razza testified that the accident caused Parks' back condition. After treating him for more than a year, Dr. Razza placed permanent restrictions on his work activities.
Pine Bluff's doctors, Dr. Richard Robichaux, an orthopaedic surgeon, and a psychiatrist, Dr. Rennie Culver, later examined him. After a five-minute examination, Dr. Robichaux found no objective evidence that he had an orthopaedic problem, and Dr. Culver testified that, in his opinion, Parks did not wish to get well.
Parks filed suit against Pine Bluff under the Jones Act and general maritime law on April 18, 1994. His wife and minor child also filed a claim for loss of consortium, which was dismissed pursuant to a motion for summary judgment and is not an issue in this appeal.
On September 5, 1995, this case was tried without a jury. On September 17, 1996, the trial judge issued his Reasons for Judgment. He awarded general damages of $200,000.00; past lost wages of $45,189.00; lost future wages of $486,442.00; lost fringe benefits of $69,617.00; expert fees and costs of $6,413.78, plus prejudgment interest from the date of the accident, September 16, 1993, on all sums awarded as past damages, and postjudgment interest on all sums awarded, including the award of prejudgment interest until paid by Pine Bluff.
Pine Bluff suspensively appealed the trial court's decision to this court.

ASSIGNMENTS OF ERROR
Pine Bluff claims that the trial court erred in:
1. Finding defendant liable since there was no evidence of negligence on the part of defendant giving rise to a cause of action under the Jones Act and the structure which caused plaintiff's injury was not a vessel in navigation giving rise to a cause of action for unseaworthiness under the general maritime law.
2. Finding that plaintiff was totally and permanently disabled which was unsupported by the weight of the evidence.
3. Issuing an excessive general damage award of $200,000.00 for an unoperated soft tissue injury.
4. Awarding future wage losses and lost fringe benefits based on the opinions of plaintiff's economist, who did not apply the proper legal standard (i.e., Culver II) and whose opinion was not supported by the evidence.

*909 5. Awarding pre-judgment interest without distinguishing between damages awarded under the Jones Act and damages arising from the unseaworthiness of a vessel.
6. The trial court's unexplained delay between trial and issuing a judgment unfairly penalized and prejudiced the defendant.
7. Awarding plaintiff post-judgment interest on pre-judgment interest.

LAW

JONES ACT NEGLIGENCE AND THE PONTOON PIPELINE'S STATUS
The trial court did not elaborate extensively on its reasons for finding Pine Bluff liable. In its Reasons for Judgment, the court stated:
This matter came before the Court for trial to determine liability under the General Maritime Law and the Jones Act. It is stipulated that the plaintiff was an employee of the defendant and enjoys Seaman status under the law. On September 16, 1993, the plaintiff was working for the defendant as a mate on the dredge "Butcher" when a railing or hand rail post broke and plaintiff was injured. At the time of the injury the plaintiff was leaning against the rail and attempting to throw a line to secure the vehicle to the side of the lock. The plaintiff fell striking the side of the vessel on his way down. Liability is clear in this case and there is no finding of negligence on the part of the plaintiff. The real issue is the extent of the plaintiff's injuries and the amount he is to be awarded.
Pine Bluff urges this court that it should not give the trial court's factual finding of liability the usual deference under the manifest error or clearly wrong standard as the trial court did not explain the factual or legal basis for its finding of liability of Pine Bluff. See Bloxom v. Bloxom, 512 So.2d 839 (La.1987). First, it is clear that in reviewing Jones Act claims brought in the state courts of Louisiana that the Louisiana standard of appellate review, rather than federal law, is the rule of decision. See Milstead v. Diamond M. Offshore, Inc., 95-2446 (La.7/2/96); 676 So.2d 89.
Having determined that Louisiana law supplies the applicable standard of review, we must decide if the less deferential Bloxom standard of review should be applied or the manifest error standard of review of Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). This is an exceptional remedy that Pine Bluff requests. "[W]e may accord deference to a decision of less than ideal clarity if the trial court's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied from the record...." Bloxom, 512 So.2d at 843. Accordingly, upon review of the record, we find that the trial court's path may be reasonably discerned and that the trial court's findings are entitled to be reviewed under the manifest error standard. Cormier v. Cliff's Drilling, Co., 93-1260 (La.App. 3 Cir. 5/4/94); 640 So.2d 552.

JONES ACT NEGLIGENCE
Pine Bluff contends that there was no evidence presented at trial showing that it knew or should have known the condition of the pipe on which Parks was injured or that it knew or should have known any condition existed which made the stanchion unsafe. However, it concedes in its brief that "the railing on the pontoon obviously should not have broken."
The Jones Act permits an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. Sec. 688(a) states:
Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States *910 conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
In Foster v. Destin Trading Corp. 96-0803, p. 3 (La.10/21/97); 700 So.2d 199, the Louisiana Supreme court said, concerning the Jones Act:
The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. See id. [Referring to 46 U.S.C.App. Sec. 688]. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. See Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, sec. 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc. 107 F.3d 331 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review Id. at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. Id. at 339.
Pine Bluff contends that under the Jones Act, an "employer must have notice and the opportunity to correct an unsafe condition before liability attaches." Colburn v. Bunge Towing, Inc., 883 F.2d 372, 374 (5th Cir. 1989). Pine Bluff argues since there was no actual or constructive notice, there can be no liability. "[T]he standard of care is not "what the employer subjectively knew, but rather what it objectively knew or should have known." Turner v. Inland Tugs Co., 689 F.Supp. 612, 619 (E.D.La.1988)." Id.
The question before us now is whether the record established evidence of negligence on the part of Pine Bluff. This finding of negligence need only be "slight" to uphold the verdict. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997). Both Ron Smith and Clay Shill, Pine Bluff employees, testified that on several occasions the pipe stanchions were run into trees and used to moor the pipeline pontoons. We find that this conduct is sufficient objective evidence that Pine Bluff knew or should have known that the pipe stanchions could become weakened from such activities and leave the pipe stanchions unable to withstand the strain of having someone lean against them while performing their duties, posing a serious risk. While the evidence of negligence is not overwhelming, considering that the pipe stanchion broke when it should not have broken, there is sufficient evidence for the trial court's finding of liability under the Jones Act against Pine Bluff. Thus, the trial court's finding was not manifestly erroneous.

THE PONTOON PIPELINE'S STATUSAN APPURTENANCE OF A VESSEL?
Pine Bluff contends that because Parks was injured on a pontoon of a floating pipeline, the warranty of seaworthiness should not attach to a section of floating dredge discharge line as an appurtenance of the dredge, which Pine Bluff admits was a vessel, when the pipeline was not attached to the dredge for dredging operations. For this reason, Pine Bluff contends that Parks has no action for unseaworthiness. We note that at trial, Pine Bluff stipulated that Parks was a "seaman" for the purposes of the Jones Act. It is clear that the M/V Dredge Butcher was a "vessel."
Alternatively, Pine Bluff argues that the floating pontoon pipeline was not a vessel. Notwithstanding, because of our holding that the floating pontoon pipeline was an appurtenance *911 to the M/V Dredge Butcher, it is not necessary for us to address this contention.
At the time this accident occurred, Parks was a member of a crew of a fleet of vessels, which included the M/V Captain Joe, the M/V Carolyn, the M/V Jena, the M/V Dredge Butcher; the crane barge and the floating pontoon pipeline, which were grouped together and acting in concert, working towards the accomplishment of a single missionto dredge sand from the Red River. This could not be accomplished without the floating pontoon pipeline, which was in navigation transporting Parks and other crewmen through the lock at the time of the accident.
The issue we have to decide is whether the pontoon pipeline was an appurtenance to the vessel, the M/V Dredge Butcher. The floating pontoon pipeline was essential to the M/V Dredge Butcher's mission. It could not perform its dredging function without the floating pontoon pipeline. The floating pontoon pipeline was an essential component of the dredge, even though readily removable, and as such was an appurtenance to the vessel Butcher, whether in actual dredging operations or dissembled and being transported in navigable water with the Butcher to a new location for dredging operations, as here. See Stewart & Stevenson Servs., Inc. v. The M/V Chris Way MacMillan, 890 F.Supp. 552 (N.D.Miss.1995).
Relying on Fox v. Taylor Diving and Salvage Co., 694 F.2d 1349 (5th Cir.1983), Pine Bluff contends that, as the floating pontoon pipeline was not in actual dredging operations and hooked up to the dredge, that the pontoon pipeline was not an appurtenance to the Butcher. We do not construe Fox so narrowly. We believe that the words "used in conjunction with the primary function of the vessel" should be broadly construed and the pontoon pipeline was being "used in conjunction with the primary function of the vessel [Butcher] at the time of the accident." Id. at 1357. The "use," in the instant case, was that the floating pontoon pipeline was in transit with the dredge to a new location and, as such, was an essential part of the dredge's operations to take place upon arrival.
There is no logical reason or public policy for this court to follow Fox in the case sub judice, as Pine Bluff urges us to do. To construe Fox as Pine Bluff desires, would mean that the floating pipeline was an essential component of the M/V Dredge Butcher when in dredging operations only, but was no longer essential to the M/V Dredge Butcher's operations when in transit to a new location with the dredge. This is illogical. If, as in Fox, the floating pontoon pipeline had been in dry dock, separated from the dredge, and non operational, as the equipment was in Fox, then the holding of Fox would be more persuasive in the instant case. But, our facts are quite different. Consequently, it only makes sense to conclude that the warranty of seaworthiness attached to the floating pontoon pipeline as an appurtenance of the vessel Butcher.
Pine Bluff, as owner of the dredge and the floating pontoon pipeline, owed an obligation of seaworthiness under the general maritime law, which is completely independent of the duty owed its employees under the Jones Act. Brister v. A.W. I., Inc., 946 F.2d 350 (5th Cir.1991); Miles v. Melrose, 882 F.2d 976 (5th Cir.1989), aff'd, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); Johnson v. Offshore Express, Inc., 845 F.2d 1347 (5th Cir.1988), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). Liability is imposed for unseaworthiness regardless of fault, negligence, or the failure to exercise due care on the part of the vessel owner. Brister, 946 F.2d 350; Miles, 882 F.2d 976; Johnson, 845 F.2d 1347. While a vessel owner is not under a duty to provide an accident free or perfect vessel, the vessel and its appurtenances must be reasonably suited for its intended use to be seaworthy. Johnson, 845 F.2d 1347; Phillips v. W. Co. of N. Am., 953 F.2d 923 (5th Cir.1992). Furthermore, Parks must have proved that the unseaworthy condition was a proximate cause of his injuries; namely, that the unseaworthy condition played a substantial part in bringing about or actually causing his injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthy *912 condition. Brister, 946 F.2d 350; Johnson, 845 F.2d 1347. The causal chain on an unseaworthiness claim is not broken even though it is established that a safer method may have existed for the performance of a task when the evidence does not establish that the seaman knew or should have known of the safer method. Johnson, 845 F.2d 1347.
It is obvious that Pine Bluff breached its duty as a vessel owner and employer. Evidence establishes that the pipeline pontoon pipe stanchion should not have broken when Parks leaned against it. Its unseaworthy condition was the proximate cause of Park's injury. See Olivier v. Best Westover, Inc., 94-994 (La.App. 5 Cir. 1/30/96); 669 So.2d 476. The trial court did not err in finding Pine Bluff liable because of the unseaworthiness of the vessel Butcher and its appurtenances.

THE NATURE OF PARKS' DISABILITY
Pine Bluff contends that the trial court's finding that Parks was totally and permanently disabled was unsupported by the weight of the evidence.
Prior to this accident, Parks had no back problems. Prior to the accident, he had taken and passed several pre-employment physical examinations required by Pine Bluff and conducted by its company doctor, Dr. Brown. The results of those examinations indicated that he was fit for duty and able to participate in unrestricted physical labor. The onset of the symptoms in this case occurred shortly after the accident.
Pine Bluff's medical witnesses testified that his injury was essentially a soft tissue injury that was not of permanent or lasting duration. However, with the exception of Dr. Robicheaux, who was an orthopedic specialist and who examined Parks for five minutes, the Pine Bluff doctors were not orthopedic specialists.
Parks' problem is orthopedic in nature. In April 1994, Dr. Bruce Razza, a Board certified orthopedic specialist with remarkable academic qualifications whose practice focuses primarily on the spine, examined Parks and treated him for an extensive period, more than a year. As Parks' treating physician, Dr. Razza's findings are entitled to far more weight than those of Dr. Robicheaux, who examined Parks for only five minutes and for litigation purposes for Pine Bluff. The trial court's Reasons for Judgment correctly rely, exclusively, on Dr. Razza's medical evaluation of Parks and his poor prognosis.
Dr. Razza's impression, after more than a year of treatment, was that Parks suffered from chronic lumbar radiculopathy, probably a problem with the disc functionally at the L4/5 level with secondary nerve root irritation, and that these conditions were permanent. As a result of this condition, Dr. Razza recommended permanent physical restrictions for Parks, specifically that he should avoid occupations involving repetitive lifting, bending, squatting, stooping, climbing, prolonged standing, or sitting. Any repetitive lifting should be restricted to fifteen pounds with a maximum lift in the forty pound range.
The record substantiates that Pine Bluff's contention that Parks was not totally and permanently disabled from his back injury is without merit.

THE AWARD FOR GENERAL DAMAGES
The trial court awarded Parks general damages of $50,000.00 for past losses and $150,000.00 for future loses. Pine Bluff contends that, according to its doctors, since he only suffered a soft tissue injury, the general damage award of the trial court is beyond all reason and should be reversed.
In Louisiana Farms v. La. Dept. of Wildlife and Fisheries, 95-845 (La.App. 3 Cir. 10/9/96); 685 So.2d 1086, 1103, writs denied, 97-0486 (La.4/4/97); 692 So.2d 420; 97-0507 (La.4/4/97); 692 So.2d 422; we said:
The trial court is afforded much discretion in granting damage awards, and this extends to special damages. Sinor v. National Casualty Company, 633 So.2d 720 (La.App. 1 Cir.1993). The trial court has great discretion is assessing damages, and the trial court's finding in this regard will not be disturbed on appeal in the absence of clear abuse of discretion. La.Civ.Code art. 2324.1; 1900 Partnership v. Bubber, *913 Inc., 27,475 (La.App. 2 Cir. 11/1/95); 662 So.2d 808, writ denied 96-0037 (La.2/28/96); 668 So.2d 369. In other words, an appellate court cannot modify a trial court's award of damages unless it is not supported by the record. Charles v. Arceneaux Ford, Inc., 542 So.2d 846 (La. App. 3 Cir.1989).
See, Hollenbeck v. Oceaneering Int'l, Inc., 96-0377 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, writ denied, 97-0493 (La.4/4/97); 692 So.2d 421.
The question we have to decide is whether "the award for particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Id. at 172.
On the day of the accident, Parks returned home, told his wife about the accident, and complained of being stiff and sore. The following morning, he did not feel any better. Realizing his injury was not improving, he called Roger Cole, Pine Bluff's time keeper, and told him he was injured and needed to complete an accident report.
On September 22, 1993, Parks was seen by his family physician, Dr. Bryan Clark McCann, a general practitioner, who had been his family physician his entire life. An examination revealed tenderness in the posterior neck base and right scapular area, on palpation and manipulation, and tenderness in the lumber spine on palpation and manipulation, but not on flexion. No abnormalities were seen on the X-rays.
Dr. McCann saw him next on September 30, 1993. Parks complained of neck and back pain and of having trouble sleeping. Dr. McCann referred him to Dr. Rivert, a neurosurgeon in Lafayette, Louisiana, on October 7, 1993. On October 29, 1993, Dr. McCann again saw Parks and there had been no improvement. His diagnosis was muscle and ligament strain to the neck and back. Dr. McCann released him from his care on February 9, 1994, thinking that he had reached his maximum medical improvement under his care. Nevertheless, he did not believe that Parks could return to regular unrestricted employment. He last saw Parks on August 28, 1995, with Parks complaining of lower back and leg pain. Dr. McCann refilled his prescriptions. He testified that, during his treatment of Parks, he saw no evidence of malingering.
Dr. James Rivet, a specialist in neurological surgery, examined Parks on October 18, 1993. During his examination, he was able to see a bilateral back muscle spasm and felt that he had a myofascial injury to the cervical and lumber spine and that he needed therapy by a Physical Medicine and Rehabilitation specialist. After such a referral, Dr. Rivet saw him again on December 27, 1993. Parks was still having back pain, going down his right leg. During the examination, the doctor noted that he had a sensory deficit and that his straight leg raising was forty-five degrees, which was twenty degrees less than normal. Although the radiology report at L-4/5 showed there was a minimal defused broad based annular disc bulge, Dr. Rivert did not think that the bugle was of any significance. He felt that Parks should be hospitalized for a myelogram and CAT scan, which was done on January 23, 1994, and which Dr. Rivet later concluded were normal.
At Dr. Rivet's request, on January 24, 1994, Dr. James Domingue, a Board Certified neurologist, examined Parks, finding no back spasm and that Parks' sensory testing was normal, as were the reflexes in his legs. He did not think that Parks needed back surgery.
On October 5, 1993, Dr. George Edwards, a staff physician in Pine Bluff's company doctor's clinic for family practice and industrial and occupational medicine, saw Parks. This clinic was run by Dr. William Brown, who testified for Pine Bluff in the trial. Dr. Edwards' physical examination revealed that Parks' forward flexion was limited to twenty-five degrees, extension of his back was limited to five degrees, and lateral flexion was ten degrees. He concluded that Parks had suffered a contusion to his lower thoracic spine, and prescribed physical therapy and a home program of low back exercises. Parks returned on October 12, 1993. He was still stiff in the mornings and had mild tenderness in the lower thoracic area, but Dr. Edwards felt that Parks had improved slightly.
*914 On October 25, 1993, Dr. Brown saw him, complaining of right leg tingling. After a physical examination, Dr. Brown concluded that his back was resolving itself. On November 1, 1993, Dr. Brown released him to return to work. He noted that his further examination of Parks on November 9, 1993, showed that Parks was able to perform exercise tests, had no evidence of muscle spasm, and that while he complained of pain, he exhibited no discomfort during the course of examination.
Notwithstanding, continued back pain caused Parks to schedule an appointment with the doctor who had treated his father for a back injury. Dr. Bruce Razza's first examination of Parks was on April 14, 1994. He made the following findings: (1) tenderness and restriction of motion in extension; (2) restriction in flexion in lateral bend; (3) tightness of musculature, compatible with spasm; (4) positive straight leg raising test; and (5) positive finding on sensory exam to the right leg, with diminished sensation in the posterolateral thigh, calf and top of the foot. He opined that the finding of a muscle spasm is objective and a reaction to a painful structure in the lower back. The positive straight leg raising test was a finding indicative of nerve irritation. The diminished sensation followed the L-5 nerve root distribution. This was consistent with Parks' complaints of the distribution of pain down the posterioral lateral leg into the big toe area; Parks' description of pain followed an objective pattern of a particular nerve root, namely the L-5, and to that extent, the finding was objective. X-rays of the lumber spine were taken on April 14, 1994, and were consistent with these findings, as they demonstrated a mild curvature compatible and consistent with the muscle spasm seen during the physical examination. Dr. Razza explained that as the muscles are attached to the bones, if the bones are pulling abnormally due to a spasm, one can see a slight curve of the bone as a result of the attachment and pull of the muscles. He specifically found hyper-mobility, which is extra motion between two bones in the lower back at the L-4/5 level.
The x-rays of April 14, 1994 were a part of a routine lumbar spine series. They looked normal, except for the one taken of Parks while bending forward. Dr. Razza found there was extra motion occurring between the L-4 relative to the L-5, and noticed that the disc space significantly opened, and at that level, unlike the levels above, one could see forward slippage of the L-4/5 relative to the L-5 and an opening of this disc space when compared to the adjacent levels. He opined that this suggests segmental instability, which is a function problem with the disc not acting like a good supporting connection between the two bones. He testified that, if one were looking at an anterior/posterior view or a lateral view, one might not recognize these findings. They were only apparent when one examined the flexion and extension views. He testified that segmental instability is significant when a patient is complaining of back pain, and when that pain radiates into the extremities in the distribution of a particular nerve root. Additionally, Parks' weakness of his big toe, which is supplied by the L-5 nerve root, is a positive finding on the neurologic examination.
Dr. Razza's April diagnosis was irritation, segmental instability, lumbar radiculopathy, and a functional problem with the disc. He testified that this was likely associated with an impaired disc function at the L-4/5 and that essentially the disc was not acting like a good shock absorber and is allowing for too much motion of the segment around the nerve.
According to Dr. Razza, Parks' low back pain and leg pain complaints were not typical of a strain. He concluded that Parks had a more serious problem. He recommended strong anti-inflammatory medicine, moist heat, exercises to try to strengthen the spine, and a lumbar corset to give added support to the muscles and to help stabilize the abnormal toggle of the disc; that Parks continue to avoid any physical work and avoid repetitive lifting greater than twenty pounds, with a maximum in the forty pound range, and to avoid prolonged standing or sitting, repetitive bending, squatting, stooping or climbing.
Dr. Razza's next examination of Parks was on May 26, 1994. Parks' complaints were *915 identical. The examination was unchanged. An MRI showed a disc bulge at the L-4/5, as well as at the L-5/S1 disc. There was also evidence of nerve root irritation. Dr. Razza concluded that Parks had a functional problem with the disc, a segmental instability. Again, he recommended use of the corset, and he gave Parks medication and a home video tape for a low back exercise regiment. He opined that Parks' disc was not working right; it was bulging because it was torn inside; apparently, the tear did not extend all the way through the annulus or the outer cover of the disc to let the nuclear material escape into the spinal canal, but the disc was probably torn and not acting like a good cushion, allowing for extra motion around the nerve. Therefore, there was intermittent irritation to the nerve, unlike a ruptured disc where there is constant pressure on the nerve.
Dr. Razza testified that with this condition, when the nerve irritation is intermittent and the nerve is pressed or stretched intermittently, often times, an EMG is negative, there is no objective nerve damage on the study, and that this was the case with Parks. Dr. Razza next considered the possibility of facet blocks at the L-4/5 and L-5/S1 levels. Facet blocks are injection procedures of cortisone and pain medication into the lower back structures to see if they can moderate the aftermath of the impaired disc function. In July 1994, on two occasions, Dr. Razza called in medication for Parks, and on July 27, 1994, he prescribed a tens unit. A tens unit is an electrical stimulation device to help reduce muscle tension and spasm, in an to attempt to reduce pain. He also prescribed a hot pack machine, which is a way of delivering moist heat to the lower back to relax the muscles.
Parks next saw Dr. Razza on August 30, 1994. Parks reported a worsening of his condition, namely a progression of the right leg pain into the big toe. Dr. Razza reported that this physical examination revealed increased tenderness. He recommended facet blocks and nerve root blocks to instill medication into the joints at L-4/5 and L-5/S1, as well as at the L-5 nerve root. The goal of the blocks was to reduce some of the inflammation which had been set up around the nerve and, conceivably, around the joints because of the functional problem with the disc. The two blocks were done on November 28, 1994. One was a right L-5 radiculogram to block the nerve; the other was a right lumbar facet arthrogram and block L-4/5, L-5/S1 for the joints. The joint blocks were positive, and the facet blocks were negative. Dr. Razza opined that Parks' response to the nerve block was further evidence that the L-5 nerve root was the culprit regarding his leg pain and the irritation in his lower back.
Dr. Razza next saw Parks again in December of 1994. Between this and the August visits, the doctor continued to prescribe anti-inflammatory and non-narcotic medication. The December 13, 1994 examination showed tenderness, spasm, and restricted range of motion in the lower back, positive straight leg raising test for the right leg, weakness in the big toe in extension, and diminished sensation for the L-5 nerve root. The diagnosis remained the same. Dr. Razza discussed with Parks the possibility of doing an epidural block, which bathes all of the nerves in the lower back area and uses a higher concentration of medication. It is similar to the nerve root blocks, but is just not selective. Dr. Razza also considered a discogram.
He testified that Parks' prognosis was guarded for spontaneous resolution of symptoms because he had complaints in excess of one year, and the complaints were not muscle strain. The problem was his nerve root irritation in the lower back as well as reactive muscle spasm. In January and February of 1995, Dr. Razza continued to prescribe medication and on February 7, 1995, Parks had an epidural block.
Dr. Razza again saw him on February 16, 1995. The examination revealed no changes from the prior examinations. Dr. Razza testified that the work restrictions he had described earlier were now permanent. He recommended that Parks learn to live with the restrictions, live with the pain without narcotics, continue anti-inflammatory medication, and obtain vocational rehabilitation. He opined that Parks must avoid occupations that involve repetitive lifting, bending, squatting, stooping, climbing, prolonged standing, *916 or sitting. Any repetitive lifting should be restricted to the fifteen pound range with a maximum lift in the forty pound range.
In May of 1995, Dr. Razza recommended that Parks repeat blocks in an effort to reduce his pain. He was also considering a discogram. He testified that "[i]n other words, the disk may be in worse shape than what I am giving it credit for and injecting dye with the disk itself can better outline what's the status of the internal architecture of the disk, [sic][a]nd tell me whether or not the diskogenic pain that is actual pain coming from the disc itself."
As for Parks' future, Dr. Razza said:
Well as I stated, ideally I would recommend this young man, I think he is about 23, to try and live with the pain and just accept limitations, try and achieve gainful employment within those restrictions if he can. If his pain is so severe and continues to progress or if he starts showing progressive neurologic deficit for example if I repeat an EMG and I start to see objectively positive or weakness on exam or atrophy, then we may need to do a discogram with a view to operative treatment. Namely, consider decompression and stabilization of the painful bony structures that I have referred to. That is eliminate motion of that painful disc and bones around the nerve as an end stage management.
Dr. Razza opined that this operative treatment would involve taking bone from the pelvic area and planting it along in another area, away from the nerves, but connected up to the bones to create a fusion so that there could be no motion around the painful disc and nerves. He would do a laminectomy to get into the spine to look at the nerves directly, and a foraminectomy, to open up holes and make sure they are wide open and that there is plenty of room for the nerves. Then, he might have to use some form of hardware to hold everything together while the fusion was trying to grow.
Dr. Razza examined Parks again on June 1, 1995. At this point, Parks pain was getting worse, and there was more radiating pain into the right hip and down the right leg and into the big toe. The examination revealed ongoing tenderness, restricted range of motion, spasm in the lower back, positive straight leg raising test, and positive findings to motor and sensory evaluation of the right L-5 nerve root. Dr. Razza's opinion was that he suffered from chronic lumbar radiculopathy, probably a problem with the disc functionally with secondary nerve root irritation. Dr. Razza was considering the possibility of nerve conduction studies and an S.E.P., which is a procedure similar to an EMG.
Dr. Razza testified that Parks' medical problems were causally connected to his accident in falling off the floating pontoon pipeline.
On December 22, 1994, Parks sought treatment from a clinical psychologist, Dr. James Quillin. He complained of persistent lower back pain, difficulty sleeping, and worry. Dr. Quillin administered two psychological tests and performed a clinical examination. The MMPI confirmed Dr. Quillin's clinical findings that Parks was suffering from a severe nonpsychotic depression. He consulted with Parks' family physician, Dr. Bryan McCann, who aided in his treatment of depression by prescribing Prozac. Parks continued to see Dr. Quillin for clinical consultation, examinations, and biofeedback.
Also on December 22, 1994, Dr. Quillin administered the Multi-Axial Pain Inventory Test. This test showed that Park's complaints of pain were well within the average of those people suffering from lower back disorders. Considering the two examinations, the MMPI and the Multi-Axial Pain Inventory test, Dr. Quillin opined that Parks was not exaggerating his pain and was not malingering. Pine Bluff's psychiatrist, Dr. Culver, also testified that Parks was not malingering.
Dr. Quillin recommended that Parks attend a pain management clinic. This would help him begin to better tolerate or cope with any residual pain from a psychological standpoint. He also recommended continued pharmacological therapy through the administration of Prozac by Dr. McCann. If Parks nonpsychotic depression were to worsen after termination of Prozac treatment, he would need to see Dr. Quillin and begin another regiment of Prozac.
*917 During the trial, the judge had ample opportunity to observe Parks. In his Reasons for Judgment, he noted: "This court had occasion to observe the plaintiff during the course of this trial and while on the witness stand. This court is convinced that plaintiff was in significant pain during the course of this trial."
The record more than adequately supports the damage awards to Parks in this case. Contrary to Pine Bluff's contention that there was no objective medical evidence for Parks' complaints of pain, Dr. Razza's analysis of his condition, relying as it does on more than a year's treatment, is the most accurate medical diagnosis of his medical problems. Dr. Razza's conclusions were not rebutted by any persuasive evidence from Pine Bluff.
Considering Parks' young age, the pain he will endure for the rest of his life, and the vast change in lifestyle forced upon him by his injuries, we cannot conclude that the trial court abused its vast discretion in awarding him $200,000.00 in general damages. This assignment of error is without merit.

THE AWARD OF FUTURE WAGE LOSSES
The trial court awarded him $45,189.00 in lost wages, $486,442.00 in loss of future wages, and $69,617.00 in loss of fringe benefits. Pine Bluff contends that the trial court committed error in awarding a total of $601,248.00 in economic damages.
The trial court's award of future economic losses was premised on the court's finding that Parks was disabled and unemployable. The record supports this finding. As his physical disability has been discussed extensively above, we will now turn to the evidence of his unemployability.
Mr. Glenn M. Hebert, a rehabilitation and vocational consultant, testified that he administered to Parks the Wide Range Achievement Test Revision 3 and the Slosson Intelligence Test revised. The Wide Range Achievement Test showed that Parks reads and spells at a second grade level, and performs arithmetic at the fourth grade level. The Slosson Intelligence Test estimated his I.Q. at sixty three, which is considered mild-mentally handicapped. Hebert testified that the Weschler Adult Intelligence Scale equivalent to that would be sixty-five, which is considered mentally retarded, and that these test scores indicated that Parks cannot work in an office environment, which requires reading, message taking, or completion of forms, nor is he able to obtain his GED or could complete any type of vocational training. He also stated that, given Parks' intellectual status and physical restrictions, he would not be able to obtain a Commercial Driver's License. As Parks' employment history established that his past occupations could be classified as heavy unskilled and semi-skilled, with the exception of his job at McDonald's, which would be classified as medium work, Hebert testified that he does not have any transferable skills that he would be able to use to obtain new occupations, given his physical disability. Further, Hebert testified that since Parks regularly takes Prozac, Ambien, Naprosyn, and Extra-Strength Tylenol, and wears a back brace and a tens unit, he is unemployable. Employers are understandably reluctant to hire anyone with an unresolved back condition, and the drugs he is taking would prevent him from operating motor vehicles or other heavy machinery. In summary, according to Hebert, given Parks' physical restrictions, limited mental capabilities, and current medical therapy, a reasonable stable labor market does not exist for him; he, simply, is not going to be able to return to gainful employment.

ECONOMIC DAMAGES
We now turn to the economic calculations of damages. The trial court adopted those of Parks' economist, Dr. Randolph Rice. Pine Bluff contends that Dr. Rice ignored the methodology in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983), cert. denied, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), which is to be used in calculating a seaman's wage loss. See Jenkins v. Kerr-McGee Corp., 613 So.2d 1097 (La.App. 3 Cir.), writ denied, 616 So.2d 701 (La.1993).
In Jenkins, 613 So.2d at 1104, this court articulated the basis for future lost wage calculations as follows:
It is well settled that future lost wage calculations in maritime cases are to be *918 performed in compliance with the method set forth in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (en banc) cert. denied sub.nom., Heinrich Schmidt Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), commonly known as Culver II. That case established a four step process for determining lost wages as follows:
(1) Estimate the loss of work life resulting from injury;
(2) Calculate the lost income stream;
(3) Compute the total amount of damages;
(4) Discount the total amount to its present value.
The lost income stream is calculated by adding gross income at the time of injury to other income (fringe benefits) then subtracting required payments by the wage earner (such as taxes and work expenses). "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned ... If forecasts of future inflation are not used, it is necessary for the fact finder to choose an appropriate below market discount rate, which process is concededly difficult". Culver, supra, at 122.
(Emphasis added.) See Cormier, 640 So.2d 552; Milstead, 663 So.2d 137. Culver II does not address the social security, or F.I.C.A. [Federal Insurance Contributions Act, 26 U.S.C. § 3101 et seq.], tax issue, but in a later portion of its opinion it withdrew those parts of the Culver I, Culver v. Slater Boat Co., 688 F.2d 280 (5th Cir.1982) (en banc), that discussed the exclusion of social security, or F.I.C.A., taxes from calculations of future wage loss.
According to Dr. Rice's testimony, the calculation of Parks' lost wages was based upon his annualized earnings at the time of the accident, or $24,991.18. Dr. Rice arrived at this figure by annualizing the income made in the year of his injury to represent what he would have made had he been able to work the full year, see Fitch v. Vintage Petroleum, Inc., 94-346 (La.App. 3 Cir. 11/2/94); 652 So.2d 998, and calculated his lost wages to the date of trial to be $45,189.00, after deductions for federal and state income taxes. He did not deduct the employee's social security, or F.I.C.A., tax contributions from his calculations of lost wages or lost future income, and he did not include the employer's contribution to social security, or F.I.C.A., taxes in his calculations. He estimated Parks' loss of work life, resulting from the injury, to be 30.44 years, and then applied the appropriate discount rate to after tax dollars, arriving at a future lost wages of $486,442.00, present value.
Relying on Jenkins, Hernandez v. M/V Rajaan, 841 F.2d 582 (5th Cir.1988), and Madore v. Ingram Tank Ships, Inc., 732 F.2d 475 (5th Cir.1984), Pine Bluff contends that Dr. Rice's inclusion of social security, or F.I.C.A., taxes in his calculations of lost wages and lost future income was error.
We note that our research does not reveal that this precise issue, whether social security, or F.I.C.A., taxes should be included in calculations of lost wages and lost future income, has been addressed by either the United States Supreme Court or the Louisiana Supreme Court. Jenkins, Hernandez, and Madore have addressed the issue in some fashion. Jenkins held that the employer's contributions to the social security, or F.I.C.A., taxes could not be included in the calculations of lost wages and lost future income, and there is a sentence that seems to say that employee contributions, likewise, should not be included in lost wage or lost future income calculations. However, the latter is clearly dicta, as it was not a holding and not necessary for the decision in Jenkins. And, apparently, it is the rule in the fourth circuit court of appeals, which based its decision on Madore. See Cappiello v. Exxon Corp., 96-2418 (La.App. 4 Cir. 5/28/97); 695 So.2d 1097.
Madore, a Jones Act case, based its award of damages for loss of future income on the principles found in Culver, 688 F.2d 280, otherwise known as Culver I. Culver I clearly calls for the deduction of social security, F.I.C.A. taxes, which the employee would have paid, in computing future lost earnings. *919 However, in Culver, 722 F.2d 114, 123, known as Culver II, the United States Fifth Circuit Court of Appeals withdrew portions of its opinion in Culver I, including those portions discussing exclusion of social security, or F.I.C.A., taxes, making no further holding regarding that issue. The court said:
For these reasons, Parts I through VI of our prior en banc decision, 688 F.2d 280, 283-95, are reaffirmed. The rule announced in Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir.) (en banc) cert. denied, 423 U.S. 839, 96 S.Ct. 68-69, 46 L.Ed.2d 58 (1975), is overruled. We withdraw, however, Parts VII through XII of our decision in Culver I. 688 F.2d at 295-311. The views expressed in this opinion shall govern the adjustment of federal damage awards for future lost earnings in this circuit.
The court could have specifically addressed the employee's contributions as deductions, when calculating future loss income, but it chose not to do so. It merely called for the deduction of "income taxes"; that is, that the lost wage calculation is to be based on "gross income" minus income taxes.
Madore, which relied on Culver I, served as the premise for the holdings on this social security, or F.I.C.A., issue in Jenkins and Cappiello. Thus, the Jenkins and Cappiello courts erred since Culver I was no longer appropriate, given the court's action in Culver II. As such, we decline to follow them.
Hernandez is a post Culver II decision in which a longshoreman was rendered a paraplegic in a work-related accident. The trial court included $56,000.00 for social security, or F.I.C.A., taxes in the calculations of lost wages. Nonetheless, in a footnote, the court stated that Hernandez agreed to a remittitur in this amount, as he conceded its inclusion was error. We are unaware of the reasons for Hernandez's agreement to the remittitur. We can only speculate that his counsel, in agreeing to the remittitur, was influenced by Madore. Although the court did not specifically discuss or hold that social security, or F.I.C.A., taxes should not have been included in the calculation of his lost wages, but merely, inferred it in a footnote, such a holding would be misplaced for the same reasons it was in Jenkins and Cappiello. The court correctly acknowledged that these calculations must be made on the basis of the principles of Culver II, which, as we discussed above, did not specifically exclude social security, or F.I.C.A., taxes from these types of calculations, yet, obviously, considered the issue.
Income and social security taxes serve different governmental purposes, and, generally, the employee is not entitled to a return of the former, which is not true regarding the latter. More specifically, social security, or F.I.C.A., taxes are comprised of federally mandated payments, required of the employee and the employer, which fund an employee's retirement or disability account. This fund is, in effect, deferred income until the employee meets the eligibility standards for collection, unlike federal and state income taxes, which are never returned to the worker. Thus, under Culver I, this retirement income is an unrecoverable loss to the permanently injured employee solely because of his injury and resulting inability to work. If the goal of the law is to reimburse the employee for his losses and make him whole, there is no rational basis for denying him or her this income to which he or she would have been entitled but for the injury and delay in its receipt. The Culver II court must have taken these factors into consideration in making the conscious decision to withdraw from its previous position in Culver I.
Further, while only persuasive, we note that social security, or F.I.C.A., taxes are not deducted from the gross wages used to calculate the estimated lost wages and lost future income in non maritime personal injury cases. See generally, Crane v. Exxon Corp., 613 So.2d 214 (La.App. 1 Cir.1992); Bernard v. Royal Ins. Co., 586 So.2d 607 (La.App. 4 Cir.), writ denied, 589 So.2d 1058 (La.1991); Sorrells v. Eddie Knippers & Assoc., Inc., 544 So.2d 556 (La.App. 1 Cir.1989); Williams v. Exxon Corp., 541 So.2d 910 (La. App. 1 Cir.), writ denied, 542 So.2d 1379 (La.1989). We can see no overriding public policy reason or rationale why the rule should be different in maritime cases. Accordingly, we hold that Dr. Rice's inclusion of *920 Parks' social security contributions, or F.I.C.A., taxes in his calculations of Parks' lost wages and future lost wages was not error, but that his failure to include those of his employer was. We remand this portion of the case to the trial court to determine, again, Parks' lost wages and future lost wages, including in those calculations Parks' employee and employer contributions for social security, or F.I.C.A., taxes.

LOST INSURANCE BENEFITS
Parks testified that he received insurance benefits from his employer. To calculate the loss of these benefits, Dr. Rice referenced a text, Employee Benefit Research. The institute is charged with collecting information on employee benefits. Employer provided health insurance is reported to be $3,256.00 per annum. Dr. Rice calculated the future value of that type of fringe benefit to be $69,617.00. The trial court was not manifestly erroneous in accepting this figure as lost fringe benefits.

THE AWARD OF PRE-JUDGMENT INTEREST
The trial court awarded pre-judgment interest from the date of the accident, September 16, 1993, on all sums awarded as past damages. Pine Bluff contends that, because the trial court did not apportion the damages between unseaworthiness and the Jones Act, it was error for the trial court to award prejudgment interest.
Contrary to Pine Bluff's contentions, prejudgment interest on past damages is proper where claims under the Jones Act and unseaworthiness are tried before a court. In Milstead; 676 So.2d at 97, the supreme court stated "where the court's power to hear a case arises from its admiralty jurisdiction, such as a general maritime action for unseaworthiness, the applicable substantive law is federal maritime law, which gives courts discretion to award prejudgment interest." Prejudgment interest should be awarded to compensate the employee for the employer's use of funds before judgment to which the employee was rightfully entitled. Socony Mobil Oil Co., Inc. v. Texas Coastal and Int'l, Inc., 559 F.2d 1008 (5th Cir.1977), cert. denied sub nom. This court has consistently upheld awards which include prejudgment interest from the date of the accident in admiralty cases. See Gray v. Texaco, Inc., 610 So.2d 1090 (La.App. 3 Cir.), writ denied, 616 So.2d 686 (La.1993); Babineaux v. Lykes Bros. S.S. Co. Inc., 608 So.2d 659 (La.App. 3 Cir.1992), writ denied, 610 So.2d 819 (La. 1993).
Pine Bluff relies on the case of Morris v. Schlumberger, Ltd., 436 So.2d 1178 (La.App. 3 Cir.1983) for the proposition that legal interest may only run from the date the judgment was signed. Unlike this case, which was a bench trial, the Morris case was tried before a jury. The parties in Morris failed to present the question of prejudgment interest to the jury. When a jury sits as the trier of fact in a mixed claim under the Jones Act and general maritime law, prejudgment interest is not allowed unless the jury apportions the damages to each claim. Id. The rule of Morris does not apply to this case. The trial court did not error in awarding pre-judgment interest on Parks past damages.
This assignment of error is without merit.

THE TRIAL COURT'S DELAY
Pine Bluff contends that it was prejudiced by reason of the trial court's delay of over one year from the date of the trial to entry of judgment; that the imposition of interest during this period was prejudicial to it.
This case was legally and factually complicated and contained extensive conflicting expert medical testimony. The trial court's careful deliberations and subsequent outstanding opinion, containing expansive findings of fact, obviously, required considerable time to prepare. The amount of time the trial court took before rendering its decision did not prejudice Pine Bluff any more than it prejudiced Parks, if at all.
This assignment of error is without merit.

THE AWARD OF POST-JUDGMENT INTEREST ON PRE-JUDGMENT INTEREST
Pine Bluff contends that the trial court committed reversible error in awarding Parks post-judgment interest upon the prejudgment interest awarded and that this part of the judgment must be reversed. It relies on Louisiana law for the proposition that *921 interest on interest is not allowed in Louisiana. See Garlepied Transfer, Inc. v. Guaranty Bank and Trust Co., 96-383 (La.App. 3 Cir. 11/14/96); 685 So.2d 194, writ denied, 96-2941 (La.1/31/97); 687 So.2d 408. Pine Bluff's reliance on Garlepied is misplaced. Garlepied had nothing to do with federal admiralty law.
Even though a case is brought in state court, federal law applies in cases brought under the Jones Act and general maritime law. See Green v. Industrial Helicopters, Inc. 593 So.2d 634 (La.1992), cert. denied, 506 U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992); Milstead, 676 So.2d 89. Federal maritime law does not prohibit including prejudgment interest as a component of damages which is then used to calculate post-judgment interest. An award of interest on damages in admiralty which themselves included an interest component is not an abuse of discretion. See Central Hudson Gas and Elec. Corp. v. Empresa Naviera Santa S. A., 56 F.3d 359 (2d Cir.1995).
This assignment of error is without merit.

CONCLUSION
With the exception of the trial court's awards of $45,189.00 for lost wages and $486,442.00 in lost future income, which are reversed, the decision of the trial court in all respects is affirmed. This case is remanded for a determination of Parks' lost wages and lost future income consistent with the holding of this opinion. Pine Bluff is cast for all costs of this appeal.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.